THOMAS B. W. STOCKTON AND CHAUNCEY S. PAYNE *v.* GARDNER D. WILLIAMS, KINTZING PRITCHETTE, CALVIN SMITH, THOMAS J. DRAKE AND ELIZABETH LYONS.

The reservation by the treaty between the United States and the Chippewa Indians, made at Saginaw, September 24, 1819, of certain designated quantities of land, to be located as the President of the United States might direct, *for the use* of persons therein named, *and their heirs*, was a reservation of an estate in *fee simple*, to each of the individual reservees.

The treaty itself operated as a grant of land to each of the several reservees, which became perfect when the land was located under the direction of the President of the United States, and no patent was necessary to perfect the title.

*Held*, that a patent issued by the President to a person claiming to be one of the reservees, was void, and could in no wise affect the title of the reservee under the treaty.

Lands may be granted by act of Congress, or by treaty, as well as by patent.

A complainant under the act of 1840, (S. L. 1840, p. 127,) before he can entitle himself to relief, must show, 1. Possession: 2. A legal or equitable title: 3. A claim set up by some other person : And, 4. His title must be *substantiated*.

A court of equity will not restrain a person from the assertion of a title to real estate, in the course of judicial proceedings, or decree a release by one to another, unless in a case entirely free from doubt.

A grant of lands, made while they are in the actual possession of a person claiming under a title adverse to that of the grantor, although void as against such person in possession, is good as between the grantor and grantee.

The grantee could not enforce his rights under the grant, in his own name, but may do so in the name of the grantor; and, if a recovery of possession could be had in his name, the grantee would be entitled to such possession, as the grantor would be estopped from questioning the validity of his own deed.

Equity will not decree a release by A to B, for the reason, merely, that the deed under which A claims was executed while B was in possession of the premises, claiming under a title adverse to that of A's grantor.

*General hearsay* and *public reputation* are inadmissible to prove which of two persons, claiming, by the same name, a particular grant or reservation made by the treaty of Saginaw, was the person intended.

What was said at the time of the treaty, by the parties to it, indicating for whose benefit the grant was intended to be made, is admissible in evidence, on the ground that it constituted a part of the *res gestæ.*

A complainant under the act of March 28, 1840, (S. L. 1840, p. 127,) is bound to establish a clear legal or equitable title in himself, before he can call upon the de fendant to release; and cannot rely upon the weakness of his adversary's title.

APPEAL from the Court of Chancery. A report of the case in that Court, will be found in Walk. Ch. R. 120.

The bill was filed in the Court of Chancery, June 11, 1840, and stated that, by a treaty between the United States and the Chippewa Indians, concluded on the 24th of September, 1819, Mokitchenoqua, alias Nancy Smith, (and since her intermarriage with Alexander D. Crane, Nancy Crane,) became entitled to a section of land near the Grand Traverse of the Flint river. That she was of Indian descent, and the reputed daughter of Jacob Smith, an Indian trader, and that she had always been known and recognized among the Chippewa Indians by the name of Mokitchenoqua. That other sections were reserved at the same place for other persons of Indian descent; and that, to give full effect to the treaty, it became necessary for the Executive of the United States not only to cause to be located and surveyed the several sections, according

to the object, intent and meaning of the treaty, but also to designate, identify, recognize and put into possession of the different sections, the several individuals entitled to each; which was attended with many difficulties, by reason of the little intercourse which had existed between the claimants and the Indians on the one hand, and the citizens of the United States on the other; and because different persons claimed the same land under the same name. That the President caused the several sections that were to be located at the Grand Traverse, amounting in all to eleven, to be surveyed and located under the treaty; and designated section number eight on the plat of the survey for Mokitchenoqua. That the Secretary of the Treasury, under the direction of the President, instructed the Register and the Receiver of the land office at Detroit to investigate and determine the respective persons to whom the lands belonged; and that they, after investigating the matter, determined Nancy Crane was the person called Mokitchenoqua in the treaty, and certified their determination, and the evidence taken by them, to the general land office at Washington; which determination, after having been received by the commissioner of the land office, was confirmed August 5th, 1835, and a certificate given on the same day, that Mokitchenoqua, alias Nancy Crane, formerly Nancy Smith, was entitled to said section eight, agreeably to the treaty. June 30th, 1835, Nancy Crane and her husband released all their interest to John Garland, from whom the complainants derived their title; and she and her husband afterwards, February 10th, 1837, deeded two-thirds of the same to Calvin Smith and Thomas J. Drake, who were charged with notice of Garland's deed. That, March 7th, 1840, a patent was issued to Mokitchenoqua, alias Nancy Crane, wife of Alexander D. Crane, formerly Nancy Smith. That Elizabeth Lyons, assuming the name of Mokitchenoqua, pretended and in-

Stockton *v.* Williams.

sisted she was the person meant by the treaty, and presented her claim to the Register and Receiver at Detroit, who gave her a certificate to that effect, which certificate was afterwards superseded by the certificate given to Nancy Crane. That Elizabeth Lyons, still pretending to have some right or interest, on the 4th of April, 1838, deeded the section to Gardner D. Williams and Kintzing Pritchette, who, in February, 1840, caused an action of ejectment to be brought against the complainant Payne. The bill prayed defendants might be decreed to release their claim to the premises, and Williams and Pritchette be restrained from prosecuting their action of ejectment.

Williams, by his answer, admitted the making of the treaty, the reservation by it of eleven sections of land at the Grand Traverse of Flint river, and that one of the number was reserved for a girl named Mokitchenoqua; but denied Nancy Smith was the person intended, or that she was known by that name among the Chippewa Indians. He also admitted the several sections had been surveyed, marked and numbered, and section eight assigned to Mokitchenoqua under the treaty; admitted the instructions given to the Register and Receiver of the land office at Detroit, and the patent of March 7th, 1840, as stated in the bill, but insisted that he and Pritchette were not affected by them. Stated that Elizabeth Lyons, the daughter of Archibald Lyons, an Indian trader, was the person intended by the treaty. That Mokitchenoqua was her Indian name, that it was given to her by the Indians when she was an infant, and before the treaty of Saginaw; that the chiefs at the treaty intended to give her a section of land, and that the same was reserved for her by her Indian name of Mokitchenoqua. That she received a certificate from the Register of the land office at Detroit; that she was Mokitchenoqua, and that she was the first, and for many years the only applicant, and received her

certificate of identity August 2d, 1824. That Marie La-
voy received a like certificate February 7th, 1827, and
Nancy Crane January 22d, 1831. That Elizabeth Lyons,
on the 4th of April, 1838, conveyed to Williams and
Pritchette, who had brought an action of ejectment against
Payne.

Pritchette put in a similar answer, and the bill was ta-
ken as confessed against the other defendants, Elizabeth
Lyons, Thomas J. Drake, and Calvin Smith.

The testimony in the case, (the more material portions
of which will be found stated in the opinion of the Chan-
cellor in this case, Walk. Ch. R. 135–139,) was very vo-
luminous, and related chiefly to the fact of whether Nan-
cy Smith, *alias* Crane, under whom the complainants
claim, or Elizabeth Lyons, under whom the defendants
claim, was the person to whom, under the Indian name
of Mokitchenoqua, the lands in controversy were intended
to be reserved by the third article of the treaty of Sagi-
naw. A statement of the testimony here, does not seem
essential to the proper understanding of the questions of
law determined by the Court.

The cause having been heard in the Court below upon
the bill, answers and proofs, the Chancellor ordered the
bill dismissed, as to all the defendants, with costs to Wil-
liams and Pritchette, but without costs to the other de-
fendants.

To obtain a reversal of this decree, the complainants
appealed to this Court.

*A. D. Fraser* and *T. Romeyn,* for the complainants.

1. The treaty did not vest in the reservees the fee of
the land reserved.

The Indian right was one of occupancy merely. Sub-
ject to this the ultimate fee was in the United States, and
was subject to grant by them. *Fletcher* v. *Peck,* 6 Cranch,

Stockton *v.* Williams.

87 ; *Johnson* v. *McIntosh,* 8 Wheat. R. 543; S. C. 5 Pet. Cond. R. 539 ; *Cherokee Nation* v. *Georgia,* 5 Pet. R. 1 ; *Worcester* v. *Georgia,* 6 Pet. R. 515; *Mitchell* v. *United States,* 9 Pet. R. 711, 745 ; 3 Kent's Com. 377.

By the terms of the treaty, the Indian right was reserved for the use of the reservees.   But the land was not granted in fee.   The treaty merely *reserved* the right of possession.   Examine the words of this treaty in connection with those of the treaty of Chicago.   (Land Laws, p. 309.)   *Godfrey* v. *Beardsley,* 2 McLean's R. 412, 416. In that case, it was admitted that a mere reservation would not pass the fee.   The treaty was held to imply a grant, only by force of the words, " *there shall be granted.*" These were properly construed to be words of grant *in præsenti.*

In the present case, the reservation to *Mokitchenoqua* is in the same words as the reservations, (in Art. 2,) of certain large bodies of land to the Indians who made the cession.   Will it be contended that, by this reservation, in the 2d article, the Indians acquired the absolute fee of the reserved lands ?

The words of the treaty import this, and no more, that the Indians reserved out of the cession certain tracts for designated individuals.   The United States, on their part, stipulate to hold them in trust for (" for the use of ") the persons named.   It is a declaration of trust on the part of the United States.   To perfect the title, a patent or conveyance was necessary.

2. If the treaty did not operate *by words of present grant,* then it was necessary to issue a patent to perfect the title of the reservees.   These are the only modes by which the fee of the government is divested.   The President was bound to see the treaty executed, and the issue of the patent was therefore lawful and proper.

3. The patent, being lawfully issued, is conclusive upon the parties in this suit.

Letters patent convey the fee without livery of seisin, even at common law. 5 Co. 94; 2 Pet. Cond. R. 104. It is a title from its date. 5 Pet. Cond. R. 272. The grant of a patent is an assertion of the title of the government; and its words convey the same idea. 5 Pet. Cond. R. 545.

A compliance with the prerequisites of the statute, as to the issuing of a patent, is to be presumed, and is deducible from the patent itself. A grant made by an officer authorized by law to make it, will be presumed to be within his powers. 10 John. R. 23; 3 Pet. Cond. R. 29; 5 Pet. Cond. R. 252, 272; 6 Pet. Cond. R. 357; 1 Pet. C. C. R. 291; 6 Pet. R. 346, 728, 731; 7 Pet. R. 51; 8 Pet. R. 436, 452–'5; 9 Pet. R. 134; 12 Pet. R. 437; 13 Pet. R. 448.

Unless a patent is void *upon its face*, or the issuing of it was without authority, or the state had no title, it cannot be avoided at law. 6 Pet. Cond. R. 358, and other cases before cited; also, Harrington's Ch. R. 142. The patent should be set aside by a proceeding in a court of equity, or by *scire facias*.

The legal title as evidenced by the patent must prevail. 1 Pet. R. 664.

If the patent issued by fraud, or on a false suggestion, it was voidable only, and must be impeached by proceedings aimed directly at it. 10 John. R. 26; 6 Cow. R. 281; 12 John. R. 77; 3 Pet. Cond. R. 291; 5 Id. 205; 6 Id. 358; 13 Pet. R. 498; 2 Saund. R. 177; 2 Land Laws, 4; Jenkins, 126, case 56, 222, case 77; *Bruckner* v. *Lawrence*, ante, 19.

A patent having regularly, and according to law, been issued by the government of the United States, for the section of land in dispute, it was incumbent on the de-

fendants to get rid of that patent, by taking the proper steps with that view, and showing that the officer who executed the same transcended his powers, or that the transaction was tainted with fraud.   Gresley's Eq. Ev. 312; Co. Litt. 225; 5 Co. R. 53; 13 Pet. R. 498, 511.   And courts will require very full proof before they so determine.   8 Pet. R. 464; 9 Id. 734.

4. The deed from E. Lyons to Williams is void, (1.) Because of the adverse possession of complainants.   (2.) For champerty.

(1.) Adverse possession operates as a bar to avoid any deed made by one out of possession; and every possession will be considered adverse until the contrary appears. *Godfroy* v. *Disbrow*, Walk. Ch. R. 260; *Bruckner* v. *Lawrence*, ante, 19, and cases therein referred to.

Adverse possession is a question of law to be decided by the court; 5 Pet. R. 402; and may be set up against any title, either to make out a title under the statute of limitations, or to show the nullity of a conveyance executed by one out of possession.   Ib.; 2 Sch. & Lef. 41.

Equity as well as law will *presume* a title in favor of one in possession.   4 J. C. R. 7; 1 Eden R. 205, 296; 11 Eng. Cond. Ch. R. 8, 67, 125.

· (2.) The defendants conceding the occupancy and improvements of complainants, any grant executed by any person other than the latter, except as a release, was void. 4 Kent's Com. 446 to 450; 5 John. R. 498, 504; 1 Blackf. 129; 11 John. R. 97; 13 John. R. 406; 9 John. R. 58, 59; 6 Cow. R. 680; 5 Pick. R. 348, 353; 11 Pet. R, 41, 53; 6 Id. 513; 20 E. C. L. R. 165; 10 Pet. R. 177; 5 J. C. R. 48, 49; 18 Ves. R. 120.

A bill to enforce a title acquired by conveyance from a person out of possession of real estate, in consideration of money advanced and to be advanced in suits for the recovery thereof, will be dismissed; for it amounts to

maintenance, and is the buying of a pretended title.   2 Story's Eq. Jur. 313 ; 3 Jac. & Walk. 135-6 ; 2 Atk. 224.

5. That deed being void, the controversy is solely with Elizabeth Lyons.   She has let the bill be taken as confessed, and as against her the complainants are entitled to a decree.   ' *Davis* v. *Davis*, 2 Atk. 23, 24 ; 10 John. R. 537, 547 ; *Williams* v. *Corwin*, Hopk. R. 471.

6. The evidence preponderates in favor of the complainants.

Hearsay evidence must be excluded.   Indian testimony is entitled to little weight.   Gresley's Ev. 237, 361 ; Willis, 550.

*H. N. Walker* and *W. Hale*, for the defendants.

*H. N. Walker.*

1. Complainants are not entitled to a decree until they show in themselves a perfect and indefeasible title to the premises in dispute.

The statute requires a release to be decreed only when " the complainant shall be able to substantiate his title ;" L. 1840, 127 ; and is intended to provide a means of *finally settling* disputed titles.   They must show a good title as against all the world.

In bills *quia timet*, courts of equity require the utmost strictness, and have even refused relief after *six trials at law*.   They will never interfere, as in this case, to *prevent* a trial at law.   2 J. C. R. 282 ; 1 Bro. P. C. 266 ; 1 Vern. 266 ; 2 Atk. 483 ; 3 John. R. 590, 594, 595, 601, 602, 603 ; 1 P. Wms. R. 672, 673, and notes ; 8 Cranch, 468.

2. The defendants are entitled to the full enjoyment of the land under the treaty of Saginaw.

(1.) The interest which passed by the treaty itself was an estate in fee.   The terms used are those generally used in Indian treaties.   See Book of Indian treaties, pages 85, 100, 132, 144, 147, 181, 182, 186, 255-6, 268.

The words, " to her heirs," create an " estate of inheritance," which is an estate " in fee simple." 1 Pow. on Dev. 165 ; 2 Toml. Law Dic. title "Heir ;" Bouv. Law Dic. title "Heir ;" 4 Kent's Com. 5 to 8.

The treaty has itself been directly passed upon by the Attorney General of the United States, (Land Laws, Part 2, 96, 97,) and by the United States Senate, (Vol. 3 Senate Doc. 1836, No. 197,) and in each instance received the construction we claim.

The right of the United States to convey the Indian lands is subject to that of the tribes, and can only be perfected by their action. 8 Wheat. R. 573 ; 6 Pet. R. 544 ; 7 Pet. R. 86 ; 10 Pet. R. 720, 729, 730 ; 12 Pet. R. 438 ; 9 Pet. R. 748.

The "right of occupancy," the title of the Indian tribes, is not recognized except as a general right, and is inconsistent with a particular *individual* possession. *That* right, so far as it affects the land in question, was terminated by the treaty which thenceforth confined it to the reservee. If Mokitchenoqua and her heirs have, as is contended, a mere " right of occupancy," that right, being unlimited in extent and duration, and inheritable, is, in terms and effect, an estate in fee.

The reservations, both general and particular, being alike in terms, if one required confirmation, the rest must also. But it will not be contended that the reservation of Indian title to the tribe could require it.

(2.) The question, "to whom did the title pass ?" must be decided like all other questions of identity, by *evidence*, in the tribunals of justice.

3. There has been no adverse possession long enough to create a right of itself.

4. Complainants, to obtain a decree, must substantiate their title. Even if the deed from E. Lyons were a nullity, the bill of complaint being taken as confessed by her,

would not give them a right to a decree without proving their case. The default of one defendant cannot prejudice others whose defence is the same; neither will it prevent the effect of their defence in defeating a claim against the one in default. Every right must rest on its own foundation, and not on another's weakness. See cases cited in point 1 ; 2 Ch. Eq. Dig. 889 ; *Dominicetti* v. *Latti,* Dick, 588; *Speidall* v. *Jervis,* Id. 632 ; *Molesworth* v. *Lord Verney,* Id. 667 ; *Clason* v. *Morris,* 10 John. R. 538, and cases there cited; *Graham* v. *Elmore,* Harrington's Ch. R. 265.

5. The deed executed by Elizabeth Lyons was not void as against her and her heirs, if void as against complainants. The defendants have a perfect equity to whatever title she held, and this Court will not divest them of it on account of adverse possession. *Livingston* v. *Peru Iron Co.,* 9 Wend. R. 516 ; *Jackson* v. *Dermont,* 9 John. R. 58, and cases there cited.

6. There has been no adverse possession in this case, sufficient to avoid the deed from E. Lyons.

To constitute a good adverse possession for such a purpose, it must have been commenced by the claimant *bona fide,* under a title which he believes, and has reason to believe, a good, perfect, and *entire* legal title. The only claim here set up was an *equity* arising from the certificate of identity. Complainants insist that the legal title was in government until the patent issued, and this deed was issued *prior* to that. *La Frombois* v. *Jackson,* 8 Cow. R. 590; *Livingston* v. *Peru Iron Co.* 9 Wend. R. 578 ; 1 Cow. R. 286 ; 9 Wend. R. 520, 521, 523 ; 12 John. R. 365 ; 7 Wend. 151; 9 John. R. 167, 174; 1 N. Y. Dig. 36 ; 5 Cow. R. 74 ; 18 John. R. 40, 355 ; 4 John. R. 181.

They can derive no benefit from the treaty to aid the adverse possession, as they did not go into possession claiming under it. 9 Wend. 511, and cases above.

7. If the title passed by the patent, defendants have no such claim as constitutes a cloud upon title against which equity will relieve. Complainants therefore can have no relief. *Wiggin* v. *Mayor, &c. of New York,* 9 Paige, 24; *Van Doren* v. *Same Defendants,* Id. 389.

8. Adverse possession is no ground of complaint in equity to obtain relief, but only avails as a defence. *Beekman* v. *Frost,* 18 John. R. 544; Ambler, 295; 2 J. C. R. 282.

9. The patent is not conclusive against the defendants, but its validity may be inquired into.

The rule of inviolability applies only in cases where the patent is made *under the authority of law, by the officer legally authorized and disposing of property belonging to the government;* 5 Cranch, 196; 9 Cranch, 98; 15 Pet. R. 105; 4 Cond. R. 659, note; 5 Wheat. 293; 3 Cond. R. 292; 10 Pet. R. 731; 2 Pet. R. 236; 1 Wash. C. C. R. 109; 2 Cond. R. 629; and never against equitable rights originating (as in this case) before its date; 15 Pet. R. 107, and above cases; 3 Pet. R. 342; nor when impeached for fraud; 10 Pet. R. 279; 13 Pet. R. 450; nor when there are conflicting titles; 13 Pet. R. 450, 516. Moreover, a treaty is, by the constitution, made the supreme law, and nothing can avail to controvert it. It may pass lands *per verba de præsenti,* like any other law. And, if any future action is required, not expressly provided for by it, Congress, as the *legislative power,* is alone competent to make the provision, before the President can pretend to act under it. 7 Pet. R. 89, and above cases.

There is no case cited or to be found in any way sustaining the doctrine that the *authority* of a public officer may not be inquired into, or that his unauthorized acts concerning matters not placed by law under his control and judgment, are binding upon any one.

10. Champerty and maintenance could not at common

law be made the ground of complaint in equity. 2 Story's Eq. Jur. 311, and 3 Cow. R. 646, where the doctrine is discussed. The statute on the subject in New York has never been re-enacted here, and we have none.

WHIPPLE, J. delivered the opinion of the Court.

The bill in this cause was filed under the provisions of an act, entitled " An act relative to proceedings in Chancery," approved March 28, 1840. The first section of the act is in the following words: "Be it enacted, &c. that any person having the possession and legal or equitable title to lands, may institute a suit against any other person or persons setting up a claim thereto, and if the complainant shall be able to substantiate his title to such land, the defendant shall be decreed to release to the complainant all claim thereto," &c. S. L. 1840, p. 127.

1. The first question to be determined is, what estate passed to the reservee under the treaty? The third article is in the following words: " There shall be reserved *for the use of each of the persons herein after mentioned, and their heirs,* which persons are all Indians by descent, the following tracts of land," &c. " For the use of Mokitchenoqua, six hundred and forty acres of land, to be located at and near the Grand Traverse of the Flint river, in such manner as the President of the United States may direct."

It is very clear that, if a fee simple estate was intended to be granted, the parties to the treaty were unfortunate in the choice of terms by which to give effect to that intention ; and yet it is difficult to conceive that any other estate was in the contemplation of the parties at the time of its execution. Will, then, the third article warrant such a construction ? It will be observed that the reservation is to the use of Mokitchenoqua and *her heirs.* No limitation as to the time of holding, or restriction upon the right of alienation, is contained in the grant. The use of

the word *heirs*, clearly implies, that such an estate was granted as would, upon her death, descend to her legal representatives.   Here then, are all the essential elements of a fee simple estate.   This construction, we think, is justified by the words of the third article, and is strengthened by the fact that it corresponds not only with an opinion given by the Attorney General of the United States, to the Secretary of War, (Land Laws, part 2, p. 96–7,) but with the opinion of the Senate, a branch of the treaty making power, which is certainly entitled to great consideration.  3d vol. Senate Doc. 1836, No. 197.  A further confirmation of this view, may be found by a reference to the numerous treaties made between the United States and the various Indian tribes.   In the treaty with the Chickasaw nation, the grant to various persons therein named, is in these words:  "One tract of land for the use of Col. George Cobert and heirs," &c.   In the treaty with the Osage tribe of Indians, the form of expression is as follows:  "From the above lands ceded and relinquished, the following reservations, for the use of the half breeds, shall be made."   But it is useless to multiply authorities upon a question which would seem to admit of little or no doubt.   I have not been unmindful of the circumstance referred to by counsel, that in other treaties with the Indian tribes, other forms of expression are made use of; such as, for instance, "there shall be granted," &c.; and, "the United States agree to grant, by patent, in fee simple," &c.   But we regard the use of such terms as the effect, rather of accident, than design; and in giving a construction to the treaty, we are to be guided by the obvious intention of the parties, and to give effect to such intention. That the intention was, to grant to the reservees named in the third article of the treaty of Saginaw, a fee simple estate, in the lands therein mentioned, we have no doubt.

2. The second question to be decided is, whether the

treaty operated as a grant, or whether a patent was necessary to convey the title.   This constitutes an interesting feature in the case before us, and was argued with much ability by counsel on both sides; and yet, upon a critical examination of the question, we find no difficulty in arriving at a conclusion entirely satisfactory to our own minds.

It was urged by the counsel for the complainants that, until the patent issued, the fee was in the government. The power of the government to grant the soil while in possession of the Indians, and subject to their right of occupancy, is a proposition which has long since been settled by a series of decisions of controlling authority.   It is equally well established that the Indians do not possess the power to dispose of the soil at their own will, to whomsoever they please; upon the principle " that discovery gave exclusive title to those who made it," and to the discoverers belonged the exclusive right of purchasing from the natives.    8 Wheat. R. 543 ; 6 Pet. R. 515.   In furtherance of the policy pursued by the United States since its existence as a separate and independent government, a treaty was entered into with the Indians at Saginaw, the object of which was to extinguish their title to the country therein described.   Here then were two parties capable of contracting; the one having the legal title and ultimate right to the land which was the subject of the contract; the other having the right of possession or occupancy, which has always been respected.   The first article cedes to the United States land comprehended within certain defined boundaries.   The second article reserves from the operation of the first, certain tracts of land for the use of the Chippewa nation.   The third article makes specific reservations in favor of certain persons of Indian descent.   The right of the Indians to the lands described in the second article, was neither enlarged nor

restrained by its provisions.   It left that right precisely as it stood before the cession contained in the first article.

We have already said that the third article contained a grant in fee simple, to the reservees therein named, and we are now to determine whether the treaty operated as a present grant or conveyance to the reservees, or whether further action was required on the part of the government to perfect the title of the reservees to the lands reserved in that article.   If it shall appear that the treaty itself operated as an absolute relinquishment of the right, title and interest, as well of the government as of the Indians, to the lands therein described, then it will follow as a corollary to this proposition, that the issuing of a patent to the reservees was unnecessary, and could confer no other or further rights upon them, than were conferred by the treaty itself, and that each must look to the treaty as the source and basis of title to the lands reserved to them respectively.   The right of the government to make a grant of lands either by treaty or act of Congress, is as unquestionable as the right to make a grant by patent issued by the President when duly authorized by law.   What then is the true construction of the treaty in this particular?   It is admitted that the language of the third article is somewhat ambiguous, and admits of a twofold construction.   In such case it is the duty of the Court to give effect to the intention of the parties to the treaty, provided we can discover what that intention was from the article itself; a resort to extrinsic evidence being inadmissible under the rules of law.   It was not denied that the article in question operated as an absolute extinguishment of the right which the Chippewas, as a nation, had in the land reserved to the several individuals named in that article.   No other or further act on their part was necessary to divest them of their pre-existing right of occupancy, or to invest the reservees, respectively, with all the rights which they, as a

nation, had before the ratification of the treaty. Being a party to the treaty, the United States sanctioned, by a solemn act, the alienation by the nation, to the several reservees therein named. If such was the legal operation of the treaty in respect to one of the parties, it is difficult to conceive why a like effect may not be given to it with respect to the other. If it operated as a present grant of the rights of the one, to the land in controversy, why may it not be so construed as to have a like operation as to the other? Let us examine, for a moment, the effect of a contrary construction of the treaty; let us see to what consequences it would lead. If the treaty did not, of itself, operate as a present grant to the several individual reservees, in whom, it may be asked, is the title to the tract in controversy? Not in the Indians; for it is admitted that they parted with their interest by the treaty. Not in the government; for it is reserved for the use of Mokitchenoqua and her heirs, and is, therefore, excluded from the operation of article first. But it may be said that the title is in the grantees of Mokitchenoqua, to whom a patent issued. But this presupposes a power on the part of the President to issue a patent for the land in question. Did this power exist? If it did, its existence must be shown; for it will hardly be contended that, under our form of government and system of laws respecting the public domain, it is competent for the President to issue a patent without the authority of law. The authority to issue patents is not inherent in the President, but belongs to Congress, who have the sole power to determine by whom, and to whom, and upon what conditions, they shall be issued, and to declare their dignity and effect. The third article of the treaty of Saginaw, does not provide that a patent shall issue; and no act of Congress has been produced authorizing the President to issue patents to the several reservees named in that article. We are bound,

therefore, to suppose that the patent issued without any authority, derived either from the treaty or any act of Congress designed to carry into effect its provisions, and is, therefore, nugatory and void. If this train of reasoning be correct, it would result that the reservee, Mokitchenoqua, or her assigns, is vested with no other or greater right in the lands in question, than belonged to the Chippewa nation before the ratification of the treaty. And, as Congress has passed no law to carry into execution the provisions of the treaty, by authorizing the President to issue patents to the individual reservees, it would follow that the government has never parted with the legal title to the tract in question. But we are bound to resist a construction that would lead to such absurd consequences, if another one, more rational, and warranted by the language of the third article, can be adopted.

The phraseology of the third article might warrant the inference that some legislation was necessary on the part of the government to perfect the titles of the reservees in the treaty. The words, " There shall be reserved," would seem to imply that something further was to be done to perfect the rights acquired under the treaty. But when it is considered that a quarter of a century has elapsed since the treaty was ratified, without any action on the part of Congress, in reference to the grants made by the third article, it is almost a necessary inference that the government have given to the treaty the construction contended for by the defendants; that, in respect to such grants, it executed itself. This view derives additional confirmation from the action of the Senate, on the report of Judge White, to which I have already adverted.

We think the view we have thus taken, cannot be overthrown, by the fact that the lands granted to Mokitchenoqua, were to be located " at and near the Grand Traverse of the Flint river, in such manner as the President of the

United States may direct." The location of the lands became a duty devolving on the President by the treaty. This duty he could execute without an act of Congress; the treaty, when ratified, being the supreme law of the land, which the President was bound to see executed. It was impossible to describe the tract granted to any of the reservees in the treaty, as it is matter of history that none of the lands ceded had ever been surveyed. But locality is given to the grant by the terms of the treaty, with an authority to locate afterwards by a survey making it definite. 10 Pet. R. 331. This authority being executed, the grant then became as valid to the particular section designated by the President, as though the description had been incorporated in the treaty itself. We are, therefore, of opinion that a fee simple passed to the reservee, Mokitchenoqua, by force of the treaty itself, and that the rights of the parties could in no wise be affected by the subsequent act of the President directing a patent to be issued.

From what has been said, it becomes unnecessary to comment upon that part of the arguments of the counsel for the complainants, relating to the acts of high public functionaries acting within the scope of their authority, or of the force and effect of a patent, regularly and according to law issued, by the government. The principles contended for, we do not controvert. On the contrary, they receive our unqualified approbation; but are, in our opinion, inapplicable to the present case.

3. We now come to the consideration of those questions which affect, more particularly, the merits of the case. To discuss these questions understandingly, it is important to analyze the provisions of the statute under which the bill is filed. Its language is very comprehensive, and would appear to confer upon the Court of Chancery unlimited jurisdiction in all cases involving the title to real

property. If a literal construction is to be given to its provisions, a concurrent jurisdiction with the courts of law is given to try actions of ejectment. Whatever may be the true interpretation of the intention of the legislature in passing the act, it is clear that the complainant, before he can entitle himself to relief, must show, 1. Possession; 2. Legal or equitable title; 3. A *claim* set up by some other person; and, 4. *His* title must be *substantiated.* Whether the case made by the bill is such an one as warranted the exercise of jurisdiction by the Court of Chancery, admits of great doubt. Supposing all the facts therein stated to be true, and that a court of equity under the statute, might claim concurrent jurisdiction with the Circuit Court of the county of Genesee, in determining the rights of the parties, yet, it would seem an extraordinary exercise of power to stay the proceedings in that Court by injunction, and wrest the case from a tribunal whose peculiar province it is to adjudicate upon precisely such a case as the complainant has made in his bill. The Circuit Court *first* obtained jurisdiction, and we are strongly inclined to believe, that the subsequent exercise of jurisdiction by the Court of Chancery, was not warranted by any sound exposition of the statute, and is repugnant to the well established principle that, where there is a concurrent jurisdiction, the right to maintain the jurisdiction attaches to that tribunal which first exercises it. This principle does not apply, it is true, to that class of cases where the remedy is difficult, and the mode of relief inadequate, in the court to which jurisdiction attaches. But we do not see why the Circuit Court of Genesee county could not have settled the rights of the parties in this case, as fully and completely in all respects as a court of equity. Indeed, the only question of fact of any real importance in the case, was as to the identity of Mokitchenoqua, the person under whom both parties claim title to

the lands in controversy. The Court of Chancery, in the exercise of its jurisdiction, might very well have submitted to a jury, under a feigned issue, that fact, and thus determined it in the very mode which the defendants, Williams and Pritchette, had selected, by instituting their action of ejectment. If there was any thing peculiar in the condition of the property, or if the complainants would be involved in oppressive litigation in asserting their rights, they might claim the assistance of the Court of Chancery, without the aid of the statute; but there is nothing in the present case which distinguishes it from that class which falls under the exclusive jurisdiction of courts of law. The defendant, Williams, however, answered, and submitted the cause to the cognizance of the Court, and we are disinclined, especially where there is a doubt as to the true construction of the statute, to permit such a question to be raised at the hearing of the merits. Such a course would be oppressive after a protracted litigation involving the complainants in great expense.

4. It is made a prominent point in the argument of the complainants counsel, that they are entitled to have the deed executed by Elizabeth Lyons to Williams and Pritchette, declared void, for the reason, that it was executed while complainants were in actual possession, claiming under a title adverse to that of the grantor. We are not disposed to review or disaffirm the doctrine laid down in the case of *Bruckner* v. *Lawrence*, (ante, 19,) referred to by counsel; but the true question is, whether, admitting that the complainants held adversely at the time of the execution of the deed from Elizabeth Lyons to Williams and Pritchette, this Court will for that reason, not simply decree the deed void, but also direct a *release* from the grantees in the deed to the complainants. No rule is better established than that a court of equity will not restrain

a person from the assertion of title in the course of judicial proceedings, or decree a release by one to another, unless in a case entirely free from doubt. *Alexander et al.* v. *Pendleton*, 8 Cranch, 220; 3 John. R. 590–'4–'5; 2 J. C. R. 282; 2 Atk. 483. This rule is especially applicable to a case where the right of a party has not been first settled at law. The bill in this case like that in the case of *Lord Tenham* v. *Herbert*, 2 Atk. 483, is in the nature of an ejectment bill. If, therefore, it shall appear that, notwithstanding the deed from Elizabeth Lyons to Williams and Pritchette is void as respects the complainants, yet, if they have rights, legal or equitable, which might still be enforced, surely a court of equity will not decree a release, and thus cut off the defendants from establishing those rights, either by an action at law or suit in equity. Apply the contrary principle to the present case, and let us contemplate the consequences which might follow, and the great injustice it might work. Suppose upon the trial of the ejectment now pending, the Court should, as they well might, adjudge the deed from Elizabeth Lyons to Williams and Pritchette to be void. This would defeat their right to recover in that case. But would they, for this reason, be entirely remediless? I apprehend not. The deed as between them and the grantor and her heirs would be good; it conveys all the interest of the grantor to the grantees. 9 Wend. R. 523; 9 John. R. 58. The grantees could not enforce it in their own names, but may do so in the name of the grantor; and, if a recovery of possession could be had in her name, Williams and Pritchette would be entitled to such possession, as she would be estopped from questioning the validity of her own deed. To authorize a court of equity to decree a release, and thus prevent a party from establishing what might prove to be a valid title at law, would be a stretch of authority which I apprehend finds no support from any

adjudged case.   We cannot, therefore, give such a lati-
tude of interpretation to the statute, as will authorize the
Court to decree a release for the reason stated.   The con-
clusion to which we have come is supported by a recent
decision in New York, in the case of *Kenneda* v. *Gardner,*
4 Hill, 469.   In that case, the bill was filed to set aside
a deed on the ground, 1. Of fraud ; and, 2. Adverse pos-
session.   In delivering the opinion of the Court, Mr. Jus-
tice *Cowen* said :   " The fraud not being proved, the ob-
jection that the deed could not avail by reason of adverse
possession, belongs exclusively to a court of law."

5.  This brings us to the consideration of the last point
to be determined.   Have the complainants *substantiated
their title?*   This must depend upon the proofs taken in
the case.   To review minutely the mass of testimony in
the transcript before us, would involve an amount of labor
I am not disposed to undertake.   A very large proportion
of that taken, is either irrelevant or incompetent; and it
is to be regretted that, in conducting the cause, more re-
gard was not paid to those rules of evidence which are of
universal application, and familiar to every lawyer.   In
this case a vast amount of labor and expense was incur-
red for no valuable purpose, and the duty devolving both
upon the counsel and the Court greatly increased, in sepa-
rating that which is legal and competent, from that which
is manifestly illegal and incompetent.   The testimony on
both sides relates principally to the establishment of one
fact: *Was Nancy Smith, alias Crane, under whom the com-
plainants claim, the person referred to in the treaty by the
Indian cognomen of Mokitchenoqua, or was Elizabeth Lyons,
under whom the defendants claim, that person ?*

In treating of " the nature and character of the evi-
dence, by which the parties must establish their rights
under the treaty," the Chancellor decided, that " hearsay
evidence is admissible to show which of the two per-

sons claiming under the treaty by the same name was the person intended." In adopting this rule, the Chancellor remarked, "that he could not well see how the right of either could be established without the aid of that kind of evidence. The reservations were donations made by the Indians to the several reservees named in the treaty, and formed a part of the consideration received by them for the lands ceded to the government. They were not the donations of an individual, but of the Chippewa nation, or people, by a public act of theirs, which concerned alike the whole Chippewa nation. This case, then, comes within the exception of the general rule excluding hearsay evidence; which exception admits it on questions of public right," &c. The Chancellor again remarks : " General hearsay, or public reputation, at the time of the treaty, among the Indians and others present at the treaty, and among the Indians since that time and before any controversy arose among the different claimants, is good evidence. So is evidence of what a person who is dead has said, who was present at the treaty, and would be likely from that circumstance to know for whom the reservation was made." In applying the foregoing rules to the testimony before him, the Chancellor arrived at the conclusion that, " the evidence decidedly preponderates in favor of the defendants." In the present case, there are two persons of the same name, to both of whom the description in the treaty is equally applicable. Extrinsic evidence, then, is competent to show to which of the two the tract in question was intended to be given. *Jackson* v. *Goes,* 13 John. R. 522. In determining this question, can the rule laid down by the Chancellor, upon correct legal principles, be sustained?

"It is a general principle in the law of evidence, that if any fact is to be substantiated against a person, it ought to be proved in his presence, by the testimony of a witness

sworn to speak the truth." 1 Stark. Ev. 229. To this general rule, however, there are exceptions as ancient as the rule itself. Does the rule laid down by the Chancellor fall within any of the exceptions recognized in the books?

" Hearsay evidence is the statement which a witness professes to have heard given by a third person as to some particular transaction or thing; literally, what the witness says he heard another person say." 1 Stark. Ev. 229. The nature of hearsay evidence,—the reasons on which it is generally excluded,—and the rules which regulate its admission,—are too familiar to need illustration. To justify its introduction, it must be shown to fall within some one of the exceptions recognized by the adjudged cases on that subject. To relax the general rule further than those cases warrant, and admit hearsay, would be dangerous in the extreme, and lead to consequences most disastrous. The exceptions to this general rule are divided by Mr. *Greenleaf*, in his excellent treatise on evidence, into four classes :—*First*, those relating to matters of public and general interest;—*Secondly*, those relating to ancient possession;—*Thirdly*, declarations against interest;—*Fourthly*, dying declarations, and some others of a miscellaneous nature. The admission of a part of what is properly hearsay evidence, was allowed by the Chancellor upon the supposition that it related to matters of public and general interest. Keeping in view the fact sought to be proved, was such evidence admissible upon the ground stated?

" The terms, *public* and *general*, are sometimes used as synonymous, meaning, merely, that which concerns a multitude of persons." Greenl. Ev. 152. Hearsay is admitted in this class of cases upon the principle that, " in matters of public interest, all persons must be presumed conversant." Id. " And, as rights which are common are

naturally talked of in the community, what is thus dropped in conversation may be presumed to be true." Id. 153. But hearsay under this head, "is admitted *only in the case of ancient rights,* and in respect to the declarations of *persons supposed to be dead ;"* the origin of the right being antecedent to the time of legal memory, and incapable of proof by living witnesses. Id. 154. Another restriction upon the admission of evidence of reputation, in such cases is, that the declarations so received must have been made, *ante litem motam.* In matters of mere *private right,* evidence of reputation or common fame is inadmissible. The reasoning of Lord *Kenyon* on this point is as follows: " Evidence of reputation, upon general points, is receivable, because all mankind being interested therein, it is natural to suppose that they may be conversant with the subjects, and that they should discourse about them, having all the same means of information. But how can this apply to private titles, either with regard to particular customs or private prescriptions? How is it possible for strangers to know any thing of what concerns only private titles." 1 Stark. 35. Reputation with respect to *particular facts,* is also inadmissible. " As, where the question on the record was, whether a turnpike was within the limits of a certain town, evidence of general reputation was admitted to show, that the bounds of the town extended as far as a certain close ; but not that formerly there were houses where none then stood." Greenl. Ev. 163. The particular subjects to which such evidence is applicable, are public prescription, customs relating to boundary, manors, parishes, highways and the like. 1 Stark. 30. The general rule to be extracted from the books is, that facts, which, from their nature or antiquity, do not admit of proof by living witnesses, may be proved by hearsay evidence.

Having hinted at some of the rules which regulate the

admission of general reputation in matters of public and general interest, and enumerated the subjects to which such evidence is usually applicable, we are now to consider whether hearsay " evidence was admissible to show which of the two persons claiming under the treaty, by the same name, was the person intended." We are of opinion that this *particular fact* could not be established by evidence of *general reputation.* The treaty itself was a public transaction; it was, perhaps, a matter of public and general interest; but it can hardly be said that the fact submitted for our decision, as to whether Nancy Crane or Elizabeth Lyons, was the person to whom the grant was made, by the Indian name of Mokitchenoqua, would be likely to excite public interest. It is a question in which the public could take no interest, because they had no *rights ;* it was not a matter, therefore, in respect to which " all persons must be presumed to be conversant." There could be no " prevailing current of assertion" to resort to as evidence, and it is to this, " that every member of the community is supposed to be privy, and to contribute his share." 1 Greenl. Ev. 153. Again, such evidence is admitted *only in the case of ancient rights.* Now, the transaction to which this evidence refers, took place in the year 1819, and the bill in this cause was filed in the year 1840. The right, therefore, is not an ancient one, and incapable of direct proof by living witnesses. We are clearly of opinion, 'for these and other reasons that might be urged, that the fact to be determined was not of *public and general interest,* and could not be proved by evidence of *general reputation.* That the question of identity is not susceptible of proof by the application of the ordinary and general rules of evidence, may be matter of regret ; but the evil consequences growing out of a relaxation of those rules, far outweigh any mischief that may result to either party from a rigid enforcement of them.

But, it is said "that *general hearsay*, or *public reputation*, at the time of the treaty, among the Indians and others present at the treaty, and among the Indians since that time, and before any controversy among the different claimants, is good evidence." The rule thus laid down by the Chancellor, we think, is too broad. The treaty was a public transaction; the parties to it were the government of the United States, represented by its commissioner, and the Chippewa nation, acting through its chiefs or principal men. Now, it is quite clear that what was said, *at the time*, by the parties to the grant, indicating the particular individual for whose benefit that grant was intended to be made, would be admissible, on the ground that what was then said constituted a part of the *res gestæ*. To the admission of such evidence there could be no objection. But we are at a loss to discover upon what principle the declarations of either the Indians or any other persons, made subsequent to the treaty, could be received to prove the fact as to which of the claimants was intended by the parties to it. The present case affords a capital illustration of the danger of admitting such evidence. It is highly probable that both the original claimants were present at the treaty, and numerous witnesses testify, not only what was said *contemporaneously with the principal fact done*, but as to what was said by Indians and others many years thereafter. Now, these witnesses differ essentially as to which of the claimants was intended by the *Indians*, while there is scarcely a syllable of evidence as to who was intended by the *other party* to the grant. This circumstance alone would weaken very much the force of such evidence, even if it were admissible. But we have sought in vain for authority, either in the elementary works or reports of adjudged cases, to warrant the introduction as evidence, of the hearsay of individuals touching the particular fact in question. We must, there-

fore, reject all evidence of this description, unless the declarations sought to be introduced can be regarded as a part of the *res gestæ.*

Applying, then, these legal principles to the testimony before us, but little is left upon which this Court can act.   The acts of the Register and Receiver of the land office, can have no influence in determining the question of identity.   They acted, it is true, under the instructions of the Treasury Department, but their adjudication can have no binding force on the parties.   The treaty did not provide a mode for adjudicating upon the question sub- ·mitted to them, and parties claiming rights, are necessarily remitted to the judicial tribunals of the country, whose judgments alone are binding and authoritative.   On the part of the complainants, there are numerous witnesses who testify that Jacob Smith had an Indian daughter, called Mokitchenoqua, while there are but two or three witnesses, Cecil Boyer and Macons, whose testimony is regarded as admissible to establish the fact that she was the person to whom the grant was intended to be made. That Elizabeth Lyons' Indian name was Mokitchenoqua, appears to be satisfactorily established. .It is also clear that she was at the treaty.   The testimony of Campau, Cochois, Trudell, Knaggs and As-sin-o-ka-man, tend to establish the fact that she was the individual referred to in the treaty.   We have given to the whole of the testimony a very careful examination, and without recapitulating that testimony here, or entering into a critical examination and analysis of its contents, with a view to determine whether it preponderates in favor of the complainants or defendants, we are all clearly of the opinion, that the complainants have not " substantiated their title to the land," by evidence so clear, satisfactory and convincing, as to authorize us to decree a release by the defendants.   From the view we have taken of the statute un-

Stockton *v.* Williams.

der which the bill was filed, it is unnecessary to determine whether the defence made by Williams and Pritchette, enures to the other defendants. We are inclined, with the Chancellor, to think that it does. But it is sufficient for the purposes of this case to say, that the bill is in the nature of an ejectment bill, and the complainants in the case, like plaintiffs in an action of ejectment in a court of law, are bound to establish a clear legal or equitable title in themselves, and cannot rely upon the weakness of their adversary's title. Not having done this, we feel bound to affirm the decree of the Court of Chancery, and permit the parties, if they see fit, to resort to another tribunal, where the questions of fact arising in the case, can be more satisfactorily settled.

*Decree affirmed.*