## FRANCIS v. FRANCIS.

ERROR TO THE SUPREME COURT OF THE STATE OF MICHIGAN.

No. 8.   Submitted October 10, 1906.—Decided December 3, 1906.

A title in fee may pass to an individual by a treaty without the aid of an act of Congress; and this rule having become a rule of property in the State of Michigan in regard to lands reserved for Indians specified in the Chippewa treaty of 1819, will not be disturbed, it not appearing that the treaty has been misinterpreted.

A patent to an Indian of land reserved to him by a treaty simply locates the land, the title to which passed under the treaty, and in the absence of any provision of the treaty, or any act of Congress, a restriction in the patent against alienation without the consent of the President is ineffectual, the President having no authority by virtue of his office to impose such a restriction.

Title to lands conveyed to an Indian in fee and which the Indian has power to alienate may be acquired by prescription.

136 Michigan, 288, affirmed.

THE facts are stated in the opinion.

Mr. Nathaniel T. Crutchfield, Mr. Thomas E. Webster, Mr. James Vankleeck and Mr. Henry M. Duffield, for plaintiff in error:

Indians being regarded as the wards of the Government should be dealt with in the utmost good faith as respects their rights under treaties, which should be construed, not according to the technical meaning of the words, but in the sense in which they would naturally be understood by the Indians. Worcester v. Georgia, 6 Pet. 515; The Kansas Indians, 5 Wall. 737, 760; Choctaw Nation v. United States, 119 U. S. 1, 27, 28; Jones v. Meehan, 175 U. S. 10.

The policy of the Government has been to permit only a possessory or beneficial right in the lands occupied by Indians, both nations and individuals, and the power of alienation except with the consent of the Government has been prohibited

by Acts of Congress of 1790, 1793, 1796 and 1802. *Cherokee Nation* v. *The State of Georgia*, 5 Pet. 17; *Buttz* v. *Northern Pacific Railroad*, 119 U. S. 67.

The tenure of individual Indians under reservations in treaties negotiated prior to June 30, 1834, was fixed by the act of March 30, 1802. This tenure could not be changed without the consent of both parties, the Indian holder and the Government; or by treaty with the Indian tribe. *Schrimpscher* v. *Stockton*, 183 U. S. 290; *United States* v. *Brooks*, 10 How. 442.

The act of 1834 did not purport to repeal in any respect the act of 1802, and § 12 of the former act did not in any manner affect tenures acquired. under the latter. At most it did no more than control and regulate tenures under treaties or grants thereafter made. *Jones* v. *Meehan*, 175 U. S. 1, 9, 12; *Gaines* v. *Nicholson*, 9 How. 365.

The right to protection against improvident alienation, as expressed in the act of 1802, was excepted from the operation of the repeal clause of the Revised Statutes. Sections 5596 *et seq.*

The reservee and his heirs acquired only such title as was controlled by the act of March 30, 1802. Though an estate of inheritance, it was under this law alienable only with the consent of the Government. *Jones* v. *Meehan*, 175 U. S. 1.

Inasmuch as the tract reserved had not been located in any other manner, the patent is essential to designate the land reserved, and the clause restricting alienation without consent of the President was notice to the world of the Government's understanding of the nature of the title granted, and its acceptance by the reservee made this construction conclusive. *Best* v. *Polk*, 18 Wall. 116; *Niles* v. *Anderson*, 5 How. (Miss.) 365; quoted in *Jones* v. *Meehan*, 175 U. S. 20. The patent issued to the reservee in 1827 contained no greater restriction on the power of alienation than was already imposed by the law itself. *Doe* v. *Wilson*, 23 How. 457; *Crews* v. *Burcham*, 1 Black, 352; *Smith* v. *Stevens*, 10 Wall. 321, 327; *Auditor* v. *Williams*, 94 Michigan, 180; *Worcester* v. *Georgia*, 6 Pet. 582. *Stockton* v. *Williams*, 1 Doug. 546, and *Dewey* v. *Campau*,

4 Michigan, 565, distinguished. ' The questions and conditions involved are entirely different.

The Bokowtonden patent was a necessary constituent of plaintiff's title. The text of the patent was also evidence of the intent of the contracting parties to the treaty. It was part of the *res gestœ*. *Eagon* v. *Eagon*, 60 Kansas, 697, 706; Wharton, Civ. Ev., 8th ed., § 262; *Humphreys* v. *Chilcat C. Co.*, 20 Oregon, 209; *Cross* v. *Hoch*, 149 Missouri, 325; *Pickering* v. *Lomax*, 145 U. S. 310, 316.

Though the estate be fee simple, alienation may be restricted. *Libbey* v. *Clark*, 14 Kansas, 435; *S. C.* 118 U. S. 255; 4 Com. Dig. Estates, 1; 7 Stat. 348; *The Kansas Indians*, 5 Wall. 740.

The claim of title by adverse possession is fraudulent on its face; the original and only instrument granting title showing the incapacity of the grantee to convey.

As the doctrine of prescription is based upon the presumption of a grant, it necessarily follows that only such rights may be prescribed for as are capable of being granted; and a grant will not be presumed where it could not lawfully be made. 22 Am. Enc. of Law, title "Prescription," and authorities cited thereunder.

*Mr. Chester L. Collins*, for defendant in error:

By the provisions of the third article of said treaty, the reservees became vested of a present alienable fee-simple title and upon the treaty being executed, all that remained to be done to complete the grant was to designate the land, which was done by a patent, but could have been done by survey and map, or by any other authenticated act of the proper officials.

The patent was not necessary and is void as a conveyance; its only office, if any, was to designate the land, which designation might have been provided for by any sufficient act of the proper officers by means other than by a patent.

Neither the treaty nor the patent mentions the names of the reserves. This is not a defect in the grant of the treaty.

The question as to who were the reservees or their legal heirs. is a question of fact for a court or jury when the question might arise. *United States* v. *Brooks*, 10 How. (U. S.) 460; *Doe* v. *Wilson*, 23 How. (U. S.) 457; *Crews* v. *Burcham*, 1 Black (U. S.), 352; *Best* v. *Polk*, 18 Wall. 112; *Jones* v. *Meehan*, 175 U. S. 1; *Stockton* v. *Williams*, 1 Walker Ch. (Mich.) 120; *Stockton* v. *Williams*, 1 Doug. (Mich.) 546; *Dewey* v. *Campau*, 4 Michigan, 565 and cases cited on p. 566; *Campau* v. *Dewey*, 9 Michigan, 381 and cases cited on p. 433; *Francis* v. *Francis*, 136 Michigan, 288.

The provision in the patent limiting the reservee's right to convey the land is void, and is not authorized or permitted by the treaty. *Mitchel* v. *United States*, 9 Pet. 760; *Pickering* v. *Lomax*, 145 U. S. 310; *Lomax* v. *Pickering*, 173 U. S. 26; *Lykens* v. *McGrath*, 184 U. S. 169; *Schrimpscher* v. *Stockton*, 183 U. S. 290; *McGannon* v. *Straightlege*, 32 Kansas, 524; *Sheldon* v. *Donohue*, 40 Kansas, 346; *Easton* v. *Salisbury*, 21 How. 426; *Sherman* v. *Buick*, 93 U. S. 209.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action of ejectment was brought to recover the possession of certain lands in Bay County, Michigan, which the plaintiff, Ann Francis, claims as tenant for her own life, and which are thus described in the declaration: "The east half, the Bokowtonden reserve, excepting land heretofore owned and occupied by F. A. Kaiser, and ten acres heretofore owned and occupied by Edward McGuiness, being in Township Fourteen, north range four east, and being a part of the Bokowtonden Reserve, conveyed by the United States to the children of Bokowtonden and their heirs, by patent, dated November sixth, A. D. 1827."

The defendants pleaded the general issue, giving notice that they would show that for more than twenty years next preceding the commencement of this action they and their grantors had been in open, notorious, exclusive, and adverse possession

and occupancy of the lands in question under claim and color of title.

At the conclusion of the evidence the jury, by direction of the court, returned a verdict for the defendants, upon which judgment was rendered. That judgment was affirmed, upon writ of error, by the Supreme Court of Michigan. 136 Michigan, 288.

By the treaty of September 24, 1819, made at Saginaw in the Territory of Michigan and proclaimed March 25, 1820, between the United States and the Chippewa Nation of Indians, the lands comprehended within certain boundaries were forever ceded to the United States. But from that cession certain tracts were reserved for the use of the Chippewa Nation of Indians. And by Art. 3 of the treaty it was provided that "there shall be reserved, for the use of each of the persons hereinafter mentioned 'and their heirs, which persons are all Indians by descent, the following tracts of land:` . . . For the use of the children of Bokowtonden six hundred and forty acres, on the Kawkawling River." 7 Stat. 203.

Subsequently, November 6, 1827, a patent was signed by President Adams. It purported to have been issued pursuant to that treaty, for a tract of six hundred and forty acres on Kawkawling River, described by metes and bounds, "unto the said children of Bowkotonden, and their heirs forever," the patent containing these words, "but never to be conveyed by them or their heirs without the consent and permission of the President of the United States."

The particular land here in question is a part of the six hundred and forty acres reserved by the above treaty for the use of the children of Bokowtonden and their heirs, and embraced by the patent of 1827. What rights were acquired, under and by virtue of the treaty, by those children? In *Jones* v. *Meehan*, 175 U. S. 1, 8, 21, where one of the questions was as to the nature of the title that passed under an Indian treaty ceding lands to the United States, and which required a certain number of acres to be set apart from the ceded lands

for a named Indian chief, this court said: "Was it a mere right of occupancy, with no power to convey the land except to the United States or by their consent? Or was it substantially a title in fee simple with full power of alienation? Undoubtedly, the right of the Indian nations or tribes to their lands within the United States was a right of possession or occupancy only; the ultimate title in fee in those lands was in the United States; and the Indian title could not be conveyed by the Indians to any one but the United States without the consent of the United States,"—citing *Johnson* v. *McIntosh*, 8 Wheat. 543; *Cherokee Nation* v. *Georgia*, 5 Pet. 1, 17; *Worcester* v. *Georgia*, 6 Pet. 515, 544; *Doe* v. *Wilson*, 23 How. 457, 463; *United States* v. *Cook*, 19 Wall. 591; *United States* v. *Kagama*, 118 U. S. 375, 381; *Buttz* v. *Northern Pacific Railroad*, 119 U. S. 55, 67. But in that case, after an extended review of previous decisions, this court further said: "The clear result of this series of decisions is that when the United States, in a treaty with an Indian tribe, and as part of the consideration for the cession by the tribe of a tract of country to the United States, make a reservation to a chief or other member of the tribe of a specified number of sections of land, whether already identified, or to be surveyed and located in the future, the treaty itself converts the reserved sections into individual property; the reservation, unless accompanied by words limiting its effect, is equivalent to a present grant of a complete title in fee simple; and that title is alienable by the grantee at his pleasure, unless the United States, by a provision of the treaty, or of an act of Congress, have expressly or impliedly prohibited or restricted its alienation."

Did an alienable title in fee simple pass to the children of Bokowtonden by virtue of the treaty of 1819–20? That question was under consideration in the courts of Michigan a long while ago and was answered in the affirmative; and it would seem that their construction of the provisions in question has become a rule of property in that State. In *Stockton* v. *Williams*, 1 Walker's Ch. (Michigan) 120, 129, decided in 1840,

the question was elaborately discussed and fully considered. The treaty in that case—the same one involved here—contained these words: "There shall be reserved, for the use of each of the persons hereinafter mentioned and their heirs, which persons are all Indians by descent, the following tracts of land. . . . For the use of Mokitchenoqua . . . each, six hundred and forty acres of land, to be located at and near the Grand Traverse of the Flint River in such manner as the President of the United States may direct." 7 Stat. 204. The Chancellor said: "It makes no mention of a patent, nor does it require the President or other officer of the Government, after the lands have been located, to do any act whatever recognizing the right of the several reservees to the different sections. All it required of the President was to have the lands located, at and near a particular place pointed out by the treaty. To locate does not mean to patent, but to have the several sections surveyed and marked out, and a map made of them, showing the particular section belonging to each of the reservees. This was done; and, when it was done, this part of the treaty was fully executed on the part of the Government. Nothing further was required to carry it into effect, and the title then vested in the respective reservees, unless we hold the treaty itself to be clearly defective, in not providing for the execution of its several stipulations. A patent, although the usual, is by no means the only mode in which the title to the public domain can pass from the Government to an individual. It may pass by an act of Congress, or by a treaty stipulation, as well as by a patent. The Indian title to the land reserved, did not pass to the United States by the treaty, which operated as a release, by both the Indians and Government, of all interest either had in the lands reserved to the respective reservees, in fee simple; and it would be a violation of the treaty for the Government to claim the land in question." Upon appeal the Supreme Court of Michigan, *Stockton* v. *Williams,* 1 Doug. 546, 558, 564, said: "The first question to be determined is, what estate passed to the reservee

under the treaty? The third article is in the following words: 'There shall be reserved for the use of each of the persons hereinafter mentioned, and their heirs, which persons are all Indians by descent, the following tracts of land,' etc. 'For the use of Mokitchenoqua, six hundred and forty acres of land, to be located at and near the Grand Traverse of the Flint River, in such manner as the President of the United States may direct.' It is very clear that, if a fee simple estate was intended to be granted, the parties to the treaty were unfortunate in the choice of terms by which to give effect to that intention; and yet it is difficult to conceive that any other estate was in the contemplation of the parties at the time of its execution. Will, then, the third article warrant such a construction? It will be observed that the reservation is to the use of Mokitchenoqua and *her heirs.* No limitation as to the time of holding, or restriction upon the right of alienation, is contained in the grant. The use of the word *heirs,* clearly implies, that such an estate was granted as would, upon her death, descend to her legal representatives. Here, then, are all the essential elements of a fee simple estate. This construction, we think, is justified by the words of the third article, and is strengthened by the fact that it corresponds not only with an opinion given by the Attorney General of the United States, to the Secretary of War (Land Laws, part 2, pp. 96, 97), but with the opinion of the Senate, a branch of the treaty making power, which is certainly entitled to great consideration. 3d vol. Senate Doc. 1836, No. 197." Again, in the same case, the court said: "The location of the lands became a duty devolving on the President by the treaty. This duty he could execute without an act of Congress; the treaty, when ratified, being the supreme law of the land, which the President was bound to see executed. It was impossible to describe the tract granted to any of the reservees in the treaty, as it is matter of history that none of the lands ceded had ever been surveyed. But locality is given to the grant by the terms of the treaty, with an authority to locate afterwards by a sur-

vey making it definite. 10 Pet. 331. This authority being executed, the grant then became as valid to the particular section designated by the President as though the description had been incorporated in the treaty itself. We are, therefore, of opinion that a fee simple passed to the reservee, Mokitchenoqua, by force of the treaty itself, and that the rights of the parties could in no wise be affected by the subsequent act of the President directing a patent to be issued."

In *Dewey* v. *Campau,* 4 Michigan, 565, 566, the court, interpreting the same treaty, said: "A title in fee, under this clause of the treaty, passed, by this language, to the reservee. The term reservation was equivalent to an absolute grant. The title passed as effectually as if the grant had been executed. The title was conferred by the treaty; it was not, however, perfect until the location was made; the location was necessary to give it identity. The location was duly made; and thus the title to the land in controversy was consummated by giving identity to that which was before unlocated." In *Campau* v. *Dewey,* 9 Michigan, 381, 433, reference was made to *Stockton* v. *Williams,* 1 Douglass, 546, above cited, the court saying: "This decision has, for sixteen years, been recognized as the law governing the titles under this treaty, at least, and these must be quite numerous, many of which have doubtless been bought and sold on the faith of this decision. We are, therefore, compelled to recognize it as a rule of property which we are not at liberty to disturb." These cases were not, in any sense, modified by *Attorney General* v. *Williams,* 94 Michigan, 180, which was the case of an Indian treaty which expressly provided that the land there in question should never be sold or alienated to any person or persons whomsoever, without the consent of the Secretary of the Interior for the time—manifestly a different case from the present one, in which the treaty contained no restriction upon alienation.

The result of the cases cited is: 1. That this court and the highest court of Michigan concur in holding that a title in fee may pass by a treaty without the aid of an act of Congress,

and without a patent. 2. That the construction of the treaty here involved, whereby the respective Indians named in its third article are held to have acquired by the treaty a title in fee to the land reserved for the use of themselves, has become a rule of property in the State where the land is situated. That rule of property should not be disturbed, unless it clearly involves a misinterpretation of the words of the treaty of 1819. We agree with the state court in holding that a title in fee passed by the treaty to the children of Bokowtónden, and that the patent issued in 1827 only located or made definite the boundaries of the tract reserved to them by the treaty. It follows that the words in the patent of 1827, "but never to be conveyed by them or their heirs, without the consent and permission of the President of the United States," were ineffectual as a restriction upon the power of alienation. The President had no authority, in virtue of his office, to impose any such restriction; certainly not, without the authority of an act of Congress, and no such act was ever passed. The children of Bokowtonden having then obtained by the treaty the right to convey, there is no reason to doubt that title could be acquired by prescription. The evidence shows that the defendants and those through whom they claim, have had peaceable, adverse possession of the premises in question continuously for more than half a century prior to the commencement of this action.

Without assigning other grounds in support of the ruling below, the judgment of the Supreme Court is

*Affirmed.*

MR. JUSTICE WHITE did not participate in the decision of this case.