[No. 2,864.]

## ADOLPHUS H. PARKER AND E. O. F. HASTINGS *v.* GREEN DUFF, AMOS HENSHAW AND LUKE ROBINSON.

POWER OF REGISTERS AND RECEIVERS OF PUBLIC LANDS. — The Registers and Receivers of the United States land offices, in permitting entries of public lands to be made, must look only to Acts of Congress and to such regulations of the General Land Office as have been made in pursuance of law. They have no powers except such as are derived from these sources.

POWER OF HEAD OF LAND DEPARTMENT.—The head of the Land Department of the United States has no authority to direct or permit entries of land to be made in the local offices, unless in cases authorized by some Act of Congress.

CONTROL OF LAND DEPARTMENT BY TREATY-MAKING POWER. — The treaty-making power cannot confer upon the Land Department any authority, nor enjoin upon it any duty in respect to the sale, conveyance or disposal of the public lands of the United States, except with the consent of Congress.

SELECTION OF PUBLIC LANDS AND PATENTS THEREFOR UNDER THE TREATY-MAKING POWER.—If a treaty is made with a tribe of Indians, by which they relinquish to the United States their lands with certain reservations, and the treaty provides that the heads of families in the tribe shall each be entitled to eighty acres of land to be selected under the direction of the President, and to be secured by patents, the officers of the Land Department cannot issue scrip for land selected under the treaty outside

of the ceded territory, nor can the President issue patents therefor in the absence of legislation by Congress authorizing it to be done.

TREATY WITH THE CHIPPEWAS.—The treaty with the Chippewas of Lake Superior and the Mississippi, dated Sept. 30, 1854, giving to each head of a family of the mixed bloods of the tribe, eighty acres of land to be selected by the President and patented, does not permit the selection of lands for such mixed bloods, on the public domain outside of the territory ceded to the United States by the Indians in the treaty.

CHIPPEWA SCRIP AND PATENTS THEREON.—Scrip issued for such lands selected *outside the ceded territory* is issued without authority of law, and patents issued therefor which show for what they were issued, are void on their face.

APPEAL from the District Court, Third Judicial District, County of Santa Clara.

Ejectment to recover lots one and two of Section 15, T. 7, south R. 1 west, Mount Diablo meridian. The complaint was in the usual form. The answer, after denying the allegations of the complaint, set up by way of cross-complaint, and for the purpose of obtaining affirmative relief, the following facts:

That in January, 1864, one H. H. Warburton was in possession of the demanded premises, and remained in possession until December 24, 1868, when he sold the same for $2,900 to defendant, Luke Robinson, and delivered possession to Robinson, and that Robinson was a qualified pre-emptor, and the land was public land and subject to pre-emption, and Robinson settled on it with the intention of pre-empting. That the plat of the survey of the township was filed in the local land office November 7th, 1866, but was suspended by an order of the Surveyor-General of the United States until the tenth day of October, 1868, when it was restored, and that defendant Robinson, on the seventh day of January, 1869, filed his declaratory statement of pre-emption. That November 4th, 1864, there was issued to Francoise Brunette by W. P. Dole, Commissioner of Indian Affairs, under and by virtue of the treaty of September 30th, 1854, between the United States and the Chippewas of Lake Superior, (Vol. 10 U. S. Statutes at Large, pages 1109, and following) a certificate, of which the following is a copy:

"Examined, No. 166, C. Department of the Interior, Office of Indian Affairs, November 4, 1864.

"I hereby certify that Francoise Brunette, of ——, in the State of Minnesota, is one of the persons described in the provisions contained in the treaty of September 30, 1854, with the Chippewas of Lake Superior, and that the said Francoise Brunette is entitled to eighty acres of land as therein provided. It is hereby expressly declared that any sale, transfer, mortgage, assignment, or pledge, of this certificate, or of any right accruing under it, will not be recognized as valid by the United States; and that the patent for lands located by virtue thereof shall be issued directly to the above named reservee, or his or her heirs, and shall in nowise enure to the benefit of any other person or persons, and the objects and purpose of this certificate is to identify the said above named Francoise Brunette as one of the persons entitled to the benefit of the provisions of the seventh clause of the second article of the treaty aforesaid.

"Given under my hand and the seal of the Department of the Interior, this day and year above written.

"W. P. DOLE, Commissioner."

That on the twenty-ninth day of November, 1864, said Brunette made and appointed one L. L. Robinson his attorney-in-fact, with full power to locate the land mentioned in said certificate in any land office of the United States. That said Brunette, on the twenty-ninth day of November, 1864, sold to one John Y. Fraser the said certificate and the land mentioned therein, and gave no deed; but, instead thereof, gave to Fraser a paper purporting to be a power of attorney, authorizing said Fraser to sell and convey the land to be selected and patented by virtue of the certificate. That, November 12, 1868, Robinson, as said attorney-in-fact of Brunette, and in the name of Brunette, made, in the United States Land Office at San Francisco, with said certificate, a location of the demanded premises, but that the location was made at the request of, and for, the benefit of the plaintiffs, and Brunette knew nothing of the same,

and never saw the land. That the Register and Receiver certified the location, and forwarded to Washington the certificate, with their endorsement that the same was located thereon, and the other documents referred to; and that the Commissioner of the General Land Office, at Washington, prepared a patent, and the President, on the tenth day of May, 1869, signed it. That Fraser, on the fifteenth day of July, 1869, pretending to act under the power of attorney from Brunette, conveyed the land to the plaintiffs. The cross-complaint further averred that the other defendants were the tenants of the defendant Robinson. There was a prayer that the plaintiffs be compelled to convey to the defendant Robinson whatever title they had, and for general relief. The Court below sustained a demurrer to this cross-complaint.

The following is the patent mentioned above:

"Examined. The United States of America. Certificate No. 166, C.

"To all to whom these presents shall come, greeting:

" Whereas, by the 7th clause of the second article of the treaty with the Chippewas of Lake Superior and the Mississippi, dated 30th September, 1854, it is provided, that 'each head of a family, or single person over twenty-one years of age, at the present time, of the mixed bloods belonging to the Chippewas of Lake Superior, shall be entitled to eighty acres of land, to be selected by them under the direction of the President.' And, whereas, there has been deposited in the General Land Office of the United States a certificate of the Register of the Land Office at San Francisco, No. 139, whereby it appears that Chippewa Certificate No. 166, C. in the name of Francoise Brunette, for eighty acres, issued by the Commissioner of Indian Affairs, under the aforesaid treaty, has been located and surrendered by the said Francoise Brunette in full satisfaction for the lots numbered one and two of section fifteen, in township seven south, of range one west, Mount Diablo meridian, in the district of lands subject to sale at San Francisco, California, containing sixty acres, according to

the official plat of the public lands returned to the General Land Office by the Surveyor-General, which said tract has been located by the said Francoise Brunette.

"Now, know ye, that the United States of America, in consideration of the premises, have given and granted, and by these presents do give and grant, unto the said Francoise Brunette, and to his heirs, the said tract above described, to have and to hold the same, together with all the rights, privileges, immunities and appurtenances of whatsoever nature thereunto belonging unto the said Francoise Brunette, and to his heirs and assigns forever.

"In testimony whereof, I, Ulysses S. Grant, President of the United States of America, have caused these letters to be made patent and the seal of the General Land Office to be hereunto affixed.

"Given under my hand, at the city of Washington, the tenth day of May, in the year of our Lord, one thousand eight hundred and sixty-nine, and of the Independence of the United States the ninety-third.

{ Seal, General Land Office }

"By the President,

"U. S. GRANT."

On the trial the plaintiffs offered the patent in evidence. The defendant objected because the patent was void upon its face for want of authority in the officers issuing it; and that it appeared upon its face that it purported to convey a portion of the public domain of the United States, and that without the authority of an Act of Congress of the United States, and therefore was void.

The Court overruled the objections, and admitted the patent in evidence. The plaintiff recovered judgment, and the defendant appealed from the judgment and from the order sustaining the demurrer to the cross-complaint.

*Moore & Laine* and *S. F. Leib*, for the Appellants, argued, that the patent was void on its face because issued without authority of law, and cited, *Patterson* v. *Winn*, 11 Wheat. 380; *Stoddard* v. *Chambers*, 2 Howard U. S. 284; and *Men-*

*ter* v. *Crommerlin*, 18 Howard U. S. 88; and U. S. Statutes at Large, Vol. 10, 1109. They also argued, that there was no authority for the acts of the land officers, and for the issuance of the patent, except the treaty; and that by a proper construction of the treaty no land could be selected outside the ceded territory. ,

They argued further, that the Constitution of the United States, (Art. IV. Sec. 3), conferred on Congress the power to make rules and regulations concerning the public domain, and that a treaty disposing of the public lands was in violation of the Constitution, and cited Story on the Constitution, Vol. 3, § 1322; *Wilcox* v. *Jackson*, 13 Pet. 516; *United States* v. *Fitzgerald*, 15 Pet. 421; *Easton* v. *Salisbury*, 21 How. U. S. 431; and *Frisbie* v. *Whitney*, 9 Wallace, 192.

*George A. Nourse*, for Respondents, argued, that the power vested by the Constitution in Congress to make rules and regulations in relation to the public domain was not exclusive, but might be exercised by the treaty-making power; as the power conferred on Congress, and the clause making treaties the supreme law of the land, were concurrent grants; and that where a collision took place, the action of the treaty-making power, or of Congress, must give way according as one or the other first took action in the matter, and cited, *Wilson* v. *Blackbird Creek Marsh*, 2 Pet. 245, The License Leases, 5 How. U. S. 504; *Houston* v. *Moore*, 5 Wheat. 1, and No. 32 of the Federalist. That, as in this case, the treaty-making power had first alienated the land, the title had passed, and cited, *Taylor* v. *Carlyle*, 20 How. U. S. 583; and *Pratt* v. *Northam*, 5 Mason 95.

*Moultrie & Lovell*, also for Respondents.

The patent is not void because the President selected the land in controversy, outside of the ceded or Indian territory. (Land Laws, Regulations and Decisions by Lester, vol. 2, pp. 371–373; Land Laws of the U. S. by Zabriskie, pp. 308–311.)

The head of the Land Department of the general government, has finally determined that it could select the lands outside the ceded territory, and this Court will not disturb

the ruling which, for obvious reasons, ought to have the force of law in such matters. (*United States* v. *The Bank of the Metropolis,* 15 Pet. 491.)

"It is no objection to the right of the first grantee, that the land finally patented did not lie within the district ceded by the treaty which made the reservation, because the recitals in the patent are conclusive; at any rate, third parties have no right to impeach the patent for such a reason." (*Crews* v. *Burcham,* 1 Black U. S. 352.)

By the Court, CROCKETT, J.:

Though there are two records in these cases, brought up on separate appeals, they constitute in fact but one case; one of the appeals being from the judgment, and the other from the order sustaining the demurrer to and dismissing the cross-complaint. It is unnecessary to decide whether this was an appealable order, and we shall treat the transcript filed on the last appeal, as only an amendment of the transcript on the first appeal.

The most important question to be considered, and which, we think, is decisive of the case, is whether the patent to Brunette, under which the plaintiff claims, is void on its face.

The patent recites, that by the second article of the treaty with the Chippewas of Lake Superior and the Mississippi, dated thirtieth September, 1854, it is provided that "each head of a family or single person over twenty-one years of age, at the present time, of the mixed bloods belonging to the Chippewas of Lake Superior, shall be entitled to eighty acres of land, to be selected by them under the direction of the President," and that there had been deposited in the General Land Office, a certificate of the Register of the Land Office at San Francisco, whereby it appears that Chippewa certificate No. 166 C, in the name of Francoise Brunette, for eighty acres, issued by the Commissioner of Indian Affairs, under the aforesaid treaty, has been located and surrendered by Brunette in full satisfaction for lots 1 and 2 (describing the premises in controversy in this action), which tract had been

located by Brunette; and thereupon the patent proceeds to grant the land to him in the usual form.   The patent is signed by the President, and is in due form.   The treaty (10 Statutes at Large, p. 1109), after providing, as quoted in the patent, also adds that the lands to be selected by the mixed bloods under the direction of the President, "shall be secured to them by patent in the usual form."

There appears to have been no act of Congress authorizing the scrip issued to these mixed blood Indians to be located on the public lands of the United States; and the argument for the defendants is, first, that under the third section of the fourth article of the Constitution of the United States, Congress has the sole power "to dispose of and make all needful rules and regulations respecting the territory and other property belonging to the United States;" and it is claimed that under the treaty-making power, the President and Senate had no authority to dispose of these lands without the consent of Congress.

Second, that if it be conceded that it is competent for the treaty-making power, under any circumstances, without the consent of Congress, to cede a portion of the public domain, nevertheless, if the treaty provides that a patent in the usual form shall issue for the ceded lands, the officers of the Land Department have no power to permit entries of the lands to be made in the local land offices, nor has the President authority to issue patents therefor, unless empowered to do so by some Act of Congress.   Under the views which we entertain in respect to the last proposition, it will be unnecessary to consider or determine the first.

In the exercise of its exclusive power under the Constitution, Congress has established a Land Department for the management and sale of the public lands.   This department is under the immediate supervision of the Commissioner of the General Land Office, subject to the supervisory control of the Secretary of the Interior.   And the subordinate duties are performed by Surveyors, Registers, and Receivers in the several districts.   The duties of all these officers are prescribed by law, or by regulations having the force of law; and, in permitting entries to be made in their

CAL. REPS. XLVII—36.

respective offices, the Registers and Receivers must look only to the Acts of Congress, and to such regulations of the General Land Office as have been made in pursuance of law. They have no powers except such as are derived from these sources; nor has the head of that department the authority to direct or permit entries to be made in the local offices, unless in cases authorized by some Act of Congress. They are the mere creatures of statutory law, from which all their powers are derived.

The treaty-making power cannot confer upon the Land Department any authority, nor enjoin upon it any duty, in respect to the sale, conveyance, or disposal of the public lands of the United States, except with the consent of Congress, which is the source of all its powers. An entry in the local land office is void, unless authorized by some Act of Congress, and the President has no authority to issue patents, except in the cases provided by law. In *Stoddard* v. *Chambers*, 2 How. 318, it was decided that a location "made on lands not liable to be thus appropriated, but expressly reserved," and a patent issued in accordance with the location, were void. In *Easton* v. *Salisbury*, 21 How. 431, the Court says: "The President of the United States has no right to issue patents for land, the sale of which is not authorized by law." In *United States* v. *Stone*, 2 Wall. 535, it was held that patents are void "where the officer has no authority in law to grant them." In *Patterson* v. *Winn*, 11 Wheat. 388, it was announced as the settled doctrine of the Court "that if a patent is absolutely void on its face, or the issuing thereof was without authority, or prohibited by statute, or the State had no title, it may be impeached collaterally in a Court of law in an action of ejectment." The same proposition is maintained in *Polk's Lessee* v. *Mendell*, 9 Cranch, 99; 5 Wheat. 303; *Ladiga* v. *Roland*, 2 Howard, 588; *Reinhart* v. *Phelps*, 6 Wall. 160,) and numerous other cases. But the plaintiff contends, inasmuch as the constitution declares a treaty to be the supreme law of the land, first, that if the treaty, as in this case, provides that patents shall issue, this provision is as obligatory as any other; second, that the acts of Con-

gress establishing and regulating the land departments, prescribe the method in which and the officers by whom patents are to be issued, and that no further legislation was necessary to carry the treaty into effect. In *Foster* v. *Neilson*, 2 Pet. 314, Chief Justice MARSHALL, in delivering the opinion of the Court, said: "Our constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in Courts of Justice as equivalent to an Act of the Legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract, when either of the parties engages to perform a particular act, the treaty addresses itself to the political and not the judicial department; and the Legislature must execute the contract before it can become a rule of the Court." In that case the language of the treaty was that "all the grants of land made before the 24th of January, 1818, by his Catholic Majesty, etc., shall be ratified and confirmed to the persons in possession, to the same extent that the same grants would be valid if the territories had remained under the dominion of his Catholic Majesty." The Court held the treaty to create only a contract, that the grants should be ratified and confirmed *in futuro*; and that until the legislative department, either directly or through its agents appointed for that purpose, had ratified the grants, they had no standing in the Courts. In *Turner* v. *The American Baptist Mission Union*, 5 McLean, 344, it was provided by a treaty with a tribe of Indians that "the net proceeds of the sale of the one hundred and sixty acres of land upon the Grand river, upon which the missionary society have erected their buildings, shall be paid to the said society, in lieu of the value of their improvements." In discussing the question whether the treaty was self-executing, the Court said: "A treaty under the Federal Constitution is declared to be the supreme law of the land. This, unquestionably, applies to all treaties when the treaty-making power, without the aid of Congress, can carry it into effect. It is not, however, and cannot be, the supreme law of the land, when the concurrence of Congress is necessary to give it effect until this

power is exercised, as where the appropriation of money is required, the treaty is not perfect  *  *  *  *  *.  Without a law, the President is not authorized to sell the public lands; so that this treaty, though so far as the Indians were concerned, was the supreme law of the land, yet, as regards the right to the proceeds of the above tract, an Act of Congress is required.  The treaty, in fact, appropriated the above tract of one hundred and sixty acres for a particular purpose, but, to effectuate that purpose, an Act of Congress was passed.

Tested by these rules, we think it is clear that the officers of the land department, in the absence of any legislation by Congress authorizing it to be done, had no authority to issue the Chippewa scrip, nor to permit entries to be made under it, and, consequently, that the patent was issued without authority of law.  The language of the treaty is, that the lands to be selected by mixed bloods, under the direction of the President, "shall be secured to them by patent in the usual form."  This imports a contract that the Government would thereafter cause the patents to be issued; and in principle, is not to be distinguished in this respect from the treaty considered in *Foster* v. *Wilson, supra,* in which it was stipulated that certain grants "shall be ratified and confirmed."  In both cases the acts were to be performed *in futuro,* and in neither could there be a performance without the aid of the legislative department.  So in *Turner* v. *The American Baptist Mission Union, supra,* it was held that a stipulation in the treaty for the sale of certain lands and the application of the proceeds could not be carried into effect without an Act of Congress.  In the case of *Stockton* v. *Williams,* 1 Doug. 546, the Supreme Court of Michigan considered the question now under discussion. The facts were that by a treaty with the Chippewas there was reserved out of the ceded lands a tract of 640 acres for the use of a half-breed woman named Mokitchenoqua, "to be located at and near the general traverse of the Flint river, in such manner as the President of the United States may direct."  The Land Department subsequently directed the Register and Receiver of the proper district to take

proofs·as to the identity of the person entitled to the reservation, and, on ascertaining the fact, to issue to such person a proper certificate.  A half-breed woman named Elizabeth Lyons, claiming that her Indian name was Mokitchenoqua, and that she was the reservee named in the treaty, made the proofs before the Register and Receiver, and received the certificate.  Several years later, another half-breed woman, named Nancy Crane, applied to the Register and Receiver for a certificate, claiming that her Indian name was Mokitchenoqua, and that she was the person for whom the reservation was made.  On hearing the proofs, the Register and Receiver awarded the certificate to her; on which a patent was afterward issued to her by the President.  The plaintiffs claimed under this title, and the defendants under the title of Elizabeth Lyons.  The plaintiffs contended that the patent was conclusive of the rights of the parties; whilst the defendants claimed that the patent was void, because it was issued without authority of law.  In considering this point, the Court said: "But it may be said that the title is in the grantees of Mokitchenoqua, to whom the patent issued.  But this presupposes a power on the part of the President to issue a patent for the land in question.  Did this power exist ?  If it did, its existence must be shown, for it will hardly be contended that under our form of government and system of laws respecting the public domain, it is competent for the President to issue a patent without the authority of law.  The authority to issue patents is not inherent in the President, but belongs to Congress, who have the sole power to determine by whom and to whom, and upon what conditions they shall be issued, and to declare their dignity and effect.  The third article of the treaty of Saginaw does not provide that a patent shall issue, and no Act of Congress has been produced authorizing the President to issue patents to the several reservees named in that article.  We are bound, therefore, to suppose that the patent issued without any authority, derived either from the treaty or any Act of Congress designed to carry into effect its provisions, and is, therefore, nugatory and void."

The Court, it will be observed, lays some stress upon the fact, that the treaty contains no provisions authorizing a patent to issue. But whatever weight this may be entitled to, in respect to lands reserved within the ceded territory, the title to which did not pass to the United States under the treaty, it is entitled to none, in respect to other lands not included within the ceded territory, and which appear on the face of the patent not to have been so included. In respect to this latter class of lands, the President has no authority to issue patents, except such as is derived from some Act of Congress. No treaty can divest the legislative department of the " sole power to determine by whom, and to whom, and upon what conditions," patents shall issue, for portions of the public domain. Whatever control the treaty-making power may exercise over lands reserved under a treaty of cession to the United States, it is clear that it cannot divest Congress of its exclusive power to determine in what cases patents shall issue for public lands not included in the ceded territory.

Thus far we have proceeded on the assumption that it was contemplated by the seventh subdivision of the second article of the treaty with the Chippewas, that each of the mixed bloods therein specified, should be entitled to eighty acres of land, to be selected by him, under the direction of the President, from any portion of the public domain of the United States, whether within or without the ceded territory. But we think this is not the proper interpretation of the treaty. By the second article there was set apart and withheld from sale six large bodies of land, for the use severally of six different bands of that tribe. Immediately following these reservations is the provision for the mixed bloods, by which each is to be entitled " to eighty acres of land to be selected by them under the direction of the President, and which shall be secured to them by patent in the usual form." The third article, after providing for a survey of the reservations, authorizes the President to " assign to each head of a family, or single person over twenty-one years of age, eighty acres of land for his or their separate use; and he may, at his discretion, as fast as the occupants

become capable of transacting their own affairs, issue patents therefor to such occupants, with such restrictions of the power of alienation as he may see fit to impose." The provisions of the third article manifestly apply only to lands within the reservation; and there is nothing to justify the inference that the lands to be secured to the mixed bloods, were not to stand upon the same footing, with the single exception, that on account, probably, of their greater intelligence and of their supposed capacity to manage their own affairs, the lands selected by them were to be immediately patented, and without any restriction as to the power of alienation. But there is nothing we think, to warrant the conclusion, that they were authorized to select lands outside of the reservations and the ceded territory. We are, therefore, of opinion, that the scrip on which the patent is founded, was issued without authority of law, and that the patent is void on its face.

This view of the case renders it unnecessary to decide the other questions discussed by counsel.

Judgment and order reversed, and cause remanded for a new trial.