FEE v. BROWN.

1. PATENTS ISSUED UPON UNAUTHORIZED LOCATIONS.—Under the act of congress of 1854, and the treaty with the Chippewa Indians in pursuance thereto, no authority was given to locate with the "scrip" issued to certain Chippewa half breeds lands outside the territory thus ceded by the Indians. A patent issued in 1868, under a location with said scrip covering land in Colorado, was therefore void.

2. POWER OF CONGRESS TO PRESCRIBE CONDITIONS FOR OBTAINING TITLE TO LANDS.—Congress has plenary power to prescribe the conditions upon which government title may be obtained and the procedure in relation thereto. It may repeal, extend, or limit previous enact-

ments at will, provided prior vested rights be not injuriously affected.

3. PERFECTING ENTRIES UNDER ACT OF 1872.—The act of congress of 1872 (U. S. Rev. St., § 2368) relates exclusively to lands taken or to be taken with Chippewa half breed scrip issued in pursuance of the treaty of 1854. It permits parties in good faith holding such scrip to perfect entries therewith, and gives a preference in the right to purchase to those who had previously "located" land with said scrip.

4. INTERPRETATION OF REMEDIAL STATUTES.—This act is clearly remedial and should receive a liberal interpretation, so as to advance the remedy. In endeavoring to discover the specific purpose of a remedial statute the particular mischief, which led to its passage and the character of information possessed by its framers in relation thereto, may be considered.

5. "GOOD FAITH"—FINDING OF SECRETARY OF INTERIOR CONCLUSIVE. —The proviso in the congressional act of 1872 above mentioned touching the good faith of the holder of scrip, relates to good faith in the manner of issuing or the manner of acquiring the certificate. The question of innocence or good faith, is a question of fact, and since its determination is lodged exclusively with the secretary of the interior, his finding is conclusive upon the courts.

6. NEW PATENTS AUTHORIZED BY STATUTE.—*Held*, that said section 2368, U. S. Revised Statutes, authorized the secretary of the interior, upon compliance therewith, to issue a patent conveying the government title to unoffered land outside the territory ceded by the Chippewa Indians, the patentee having in good faith located such land with Chippewa half breed scrip and obtained a void patent therefor prior to the adoption of the remedial act.

*Appeal from District Court of Pueblo County.*

EJECTMENT by Jane C. Brown, appellee, against John D. Fee, appellant, to recover possession of certain lands in Pueblo county. Judgment in favor of Mrs. Brown; appeal by Fee.

The essential facts shown by the pleadings and stipulation are briefly as follows: On September 30, 1854, the United States concluded a treaty, which in pursuance of an act of congress adopted the same year, was proclaimed in January, 1855, with the Chippewa Indians of Lake Superior and the Mississippi, whereby certain of their lands were ceded to the government. Vol. 10, p. 1109, U. S. Statutes at Large. By the seventh clause of the second article of this treaty the

government agreed to grant by patent eighty acres of land to " each head of a family or single person over twenty-one years of age at the present time of mixed bloods belonging to the Chippewas of Lake Superior." In executing this provision, the beneficiaries were identified by the issuance of certificates commonly called " Chippewa Half Breed Scrip." The certificates were non assignable, and contained the following provision, that " the patent for lands located by virtue thereof shall be issued directly to the scripee, his heirs or assigns." There was no prohibition against a conveyance by the beneficiary of the patent title when once acquired. The statute of 1854 confined the selection by the beneficiaries to lands within the ceded territory. But there was no provision in any of the certificates issued prior to July 6, 1868, thus limiting their purchasing power. And the certificates were expressly recognized and received by the officials of the general land office as locatable upon any portion of the public domain subject to entry.

In the course of a few years these certificates became an article of trade and were kept on sale by brokers and bankers. The provision relating to assignments was evaded by procuring from the scripee at the time of purchasing the certificate or scrip two powers of attorney, both executed in blank as to the names of agents and description of land. One power of attorney authorized the location of the scrip in the name of the scripee, and the other authorized the conveyance of the patent title issued to the scripee.

Prior to February 9, 1867, one Mary Dauphinias received a certificate—" No. 45 D."—as a beneficiary under said treaty. This certificate together with the requisite powers of attorney come into the hands of one Daniel Witter, who, as attorney in fact for Mary Dauphinias, located the land in controversy.

On December 29, 1868, a United States patent therefor issued to said Dauphinias and under his second power of attorney Witter conveyed the same by deed to Henry C. Brown.

In 1872, congress after investigating the abuses connect-

ed with the issue and use of the Chippewa half-breed scrip, adopted a special act of congress authorizing the secretary of the interior to permit the purchase of land held by means of these certificates and the completion of entries of claims made thereunder where the parties interested were innocent and were acting in good faith.    U. S. Rev. Stats., sec. 2368.

In 1874, the supreme court of California declared a patent issued prior to 1872 similar to the one under which Henry C. Brown held title void on its face, because the land patented was outside the ceded territory.    In 1875, Brown having discovered the invalidity of his patent, made application for a new patent, which upon the certificate of the register reciting his compliance with requirements of the land office, issued December 1, 1876.    Thereafter, and before the commencement of this suit, Henry C. Brown conveyed the premises by a good and sufficient deed to Jane C. Brown.

In August, 1888, appellant Fee took possession of the premises in controversy and proceeded to make valuable improvements thereon.    In September following, having established his residence thereon with the intention of procuring title, he made application in writing in due form to enter such land as a homestead in the proper land office, and tendered all legal fees and commissions due in connection with such applications.    When this suit was begun and when trial was had, this homestead application was still pending and undetermined before the land department.

The original patent to Mary Dauphinias, letters by the commissioner of the general land office showing the action of the land department in dealing with Chippewa half-breed scrip and in dealing with land located thereunder, a certificate by the register, and a receipt by the receiver of the land office at Pueblo, together with other evidential documents and instruments appear in *hæc verba* in the record; but it is deemed unnecessary to set them out in full.    The substance thereof as well as all remaining important facts sufficiently appear in the opinion.

Mr. FRED. BETTS, for appellant.

Mr. JAMES H. BROWN, for appellee.

MR. JUSTICE HELM delivered the opinion of the court.

The patent, of 1868 through which Henry C. Brown orig-
inally claimed title was invalid. It was based upon the
Chippewa half-breed certificate of scrip issued to Mary
Dauphinias. This certificate was given in pursuance of the
seventh clause, second article, of the treaty of 1854 with the
Chippewa Indians. But this treaty is to be construed in
connection with the act of congress of 1854 by which it was
authorized; and that act limited the selection of lands by
the beneficiaries named to the territory ceded by the Indians
under the treaty. But the territory thus ceded was en-
tirely within the states of Minnesota and Wisconsin. There
was, therefore, in 1868, when the Dauphinias certificate was
located and the Dauphinias patent issued, *no authority of
law* for locating Chippewa half-breed scrip upon land in
Colorado, or for patenting such locations. *Parker v. Duff*,
47 Cal. 554.

Hence it was, as we shall presently see, that after the de-
cision of *Parker v. Duff, supra*, holding such patents void,
Brown undertook to avail himself of the benefit of the act of
congress of 1872. He surrendered the original patent, exe-
cuted a deed of relinquishment, paid the extra sum demanded
of $2.50 per acre, and complied with all other requirements
of the land department; in 1876 a new patent issued to him
for the premises originally located, being the same prem-
ises now in controversy. Upon the validity of the latter
patent rests the decision of the case.

Appellee's counsel vigorously contends that appellant be-
ing a stranger to the patent and not having in any way con-
nected himself with the title from the government, is a mere
trespasser and not in position to invoke the rule permitting
an outstanding title to be shown by defendants in the action

of ejectment. It is asserted that appellee's prior possession under the patent of 1876, even if it were void, would prevail in this action as against appellant, whose entry and subse- quent acts amount to nothing more than a naked trespass.

Again, it is strenuously insisted on behalf of appellee, that even if appellant occupies such a legal *status* as would enable him to attack the validity of the patent of 1876, that docu- ment is not void on its face and therefore must prevail in this action. To show the validity of the patent, appellant's counsel relies upon the rule that an instrument referred to in a deed is to be considered as incorporated therein. Hence he argues, that since the patent mentions a certificate made by the register showing compliance by Brown with the land office requirements, and since this certificate also refers to commissioner's letter " C " of July 19, 1876, which letter in turn refers to commissioner's letter of May 11, 1875, these documents are in contemplation of law incorporated into the patent. And by means of this incorporation, it is claimed the invalidity of the patent is made to appear upon its face. The correctness of this broad application of the doctrine of reference is forcibly combatted. .

But under the view we shall adopt concerning the scope and effect of the act of congress of June 8, 1872, it is unne- cessary to discuss or determine either of the foregoing ques- tions. For the purposes of the present decision, we shall assume (without indicating any conclusion thereon) that appellant could defeat the action by showing an outstanding title in the United States, and that the instruments above referred to are to be treated as a part of the patent, without limitation to the particular purpose for which it is contended the reference was made.

The validity of the patent of 1876 is challenged on the ground that its issuance was not authorized by law. We are told that neither the act of April 24, 1820, which was the general statute in force providing for the patenting of gov- ernment lands, nor the remedial act of 1872 permitted the issue of this patent. This contention is predictated upon the

following grounds: *First*, that *the offering of land* at public auction is a condition precedent to its entry or patent under the act of 1820. And that in view of the admitted averment of the answer, coupled with the rejection of evidence, we are bound to regard the land in controversy as never having been "offered." *Second*, that the act of 1872 was only intended to permit the purchase of land in the ceded territory. And the ceded territory being entirely within the states of Minnesota and Wisconsin, land in Colorado is not within the purview of the act. *Third*, that the act of 1872 applied only to *unpatented claims* and was not intended to give relief where, as in the case at bar, patents had at the time of its adoption actually issued and were outstanding. *Fourth*, that only "*innocent parties in good faith*" holding Chippewa "claims" or holding locations thereunder were entitled to the benefit of this statute. And that since Brown, the patentee, must be held to have known the limitation in the act of 1854 confining the location of Chippewa half-breed certificates to the ceded territory, he cannot be regarded in law as an "innocent party" acting "in good faith."

True it is that "unoffered" lands are not subject to private entry under the act of 1820. U. S. Rev. Stats., sec. 2357. And it is admitted that the patent to Brown recites that he had "made full payment" for the land in controversy according to the provisions of that statute. This admission may be literally true; Brown's deposit may have complied with the formal requirements of the act. But the patent recital does not amount to a declaration that the patent issued under this statute *alone*. On the contrary, the recitation of the patent, that the government "in consideration of the premises and in conformity with the *several acts of congress in such case made and provided*" granted, etc., shows that it also issued under such other acts, if any, as were applicable. If, therefore, the act of 1872 was pertinent, it may be that this provision of the statute of 1820 was thereby waived as to tracts like the one in dispute.

Counsel for appellant concedes in argument that Brown

attempted to invoke the statute of 1872, and that the various land officers were also endeavoring to act thereunder in receiving his money and in issuing to him the patent of 1876. In this concession counsel is undoubtedly correct. We therefore proceed to examine that statute for the purpose of determining whether it does or does not authorize the action of the land department in the premises.

It is entitled " An act to perfect certain land-titles therein described,"and reads:

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior be, and he is hereby, authorized to permit the purchase, with cash or military bounty-land warrants, of such lands as may have been located with claims arising under the seventh clause of the second article of the treaty of September thirtieth, eighteen hundred and fifty-four, at such price per acre as the secretary of the interior shall deem equitable and proper, but not at a less price than one dollar and twenty-five cents per acre, and that owners and holders of such claims in good faith be also permitted to complete their entries, and to perfect their titles under such claims upon compliance with the terms above mentioned; *Provided,* That it shall be shown to the satisfaction of the Secretary of the Interior that said claims are held by innocent parties in good faith, and that the locations made under such claims have been made in good faith and by innocent holders of the same."

That this statute relates exclusively to lands taken or to be taken with Chippewa half-breed scrip issued in pursuance of the Chippewa treaty of 1854 cannot be doubted. It is not, strictly speaking, a confirmation of grants previously made. It permits parties in good faith holding these certificates to perfect entries therewith. But in so doing such parties are required to make additional payments in accordance with the act and to comply also with its remaining provisions.

As to all other persons included, the substantial effect of the statute is to simply give them a preference by which they

are enabled to procure title thereunder for lands previously selected and, to use the statutory phrase, "located with" this scrip. The act is clearly remedial and should receive a liberal interpretation so as to advance the remedy. In endeavoring to discover its specific purpose we should consider, among other things, the particular *mischief* which led to its passage, and the character of the information possessed by its framers in relation thereto.

Frauds and evasions of law existed in connection with the issue and sale of Chippewa half-breed certificates. So serious had these abuses become that in December, 1871, congress by resolution called upon the secretary of the interior for information touching the subject. Promptly upon receipt of this information, the statute of 1872 was adopted. The fourth paragraph of the congressional resolution asked for "a copy of said scrip, the manner of locating the same, whether by the parties to whom it was issued or by others, whether located upon lands ceded by said tribe, and all decisions of the department of the interior in relation to the issuance and location of said scrip." Among other facts of which congress thus secured knowledge, are the following : That many certificates of this scrip had issued to fictitious persons, and that other extensive and systematic frauds existed in connection therewith ; that the secretary of the interior had declared a large portion of the scrip void, and had ordered all unpatented entries to be canceled. But congress was also informed that the land department by means of circulars and letters had for a long period held that the Chippewa certificates issued in pursuance of the treaty were locatable upon any unoccupied public lands subject to pre-emption *whether outside or inside the ceded territory ;* that there was nothing in the certificates issued before July 6, 1868, to indicate that the purchasing power of this scrip was limited to the ceded territory ; that prior to February 26, 1872, six hundred and thirty patents had been issued for land taken with Chippewa half-breed certificates ; that one hundred and fifty-six of said six hundred and thirty patents

covered lands in California, Colorado, Dakota and Utah, lands not within any part of the territory ceded by the Indians; and that a total of three hundred and fifty-two related to lands outside the state of Minnesota, to which state counsel for appellant asserts the act of 1872 was limited.

In the light of this knowledge by congress when the statute was adopted, what are the reasonable inferences concerning its purpose? It appeared to that body that many innocent parties, misled by the action of the land department, would be injured through the cancellation of certificates and entries. The remedial statute under consideration was undoubtedly intended to aid such parties, viz., innocent individuals who had attempted or were attempting or about to attempt to procure title to government lands by means of Chippewa half-breed scrip. The language of the statute is general and sweeping; it contains no words expressly excluding from its purview lands then *patented*, *unoffered* lands, or lands *outside the ceded territory.* Its operation is, so far as the language employed is concerned, wholly unlimited, save as to the matter contained in the single proviso, viz., that as a condition precedent to patent thereunder proofs shall be offered satisfying the secretary of the interior that the respective claimants are " innocent parties in good faith."

It should be remembered in passing that the exceptions contended for, will, if recognized as part of the statute, become the means of *overthrowing* not of *upholding* the patent; and of course such recognition should, under the circumstances, be coerced by very strong legal considerations. A further suggestion also worthy of notice, is that the very fact that congress put in a proviso limiting the scope of the legislation in one particular tends to show that if other limitations had been designed, they would have received express mention.

In the disposition of the public lands, congress is omnipotent. It has plenary power to prescribe the conditions upon which government title may be obtained, and the procedure in relation thereto. It may donate the land, or it may exact

different prices and affix different conditions in connection with the acquisition of title to different tracts. It may repeal, extend, or limit previous enactments at will, provided prior vested rights be not injuriously affected.

We proceed to the further consideration of the law of 1872 with the preliminary suggestion, that the word "claims" therein employed, means the scrip or certificates issued to the Chippewa beneficiaries specified in the statute and treaty of 1854. This word does not refer to the act of selecting and segregating land from the public domain under or by means of these certificates. The declarations in the affirmative portion of the law, "lands that have been located with said claims," etc., and in the proviso of the law, "locations made under such claims," avoid all doubt upon this subject.

It will be observed that the congressional inquiry above mentioned expressly asked in relation to the scrip, "whether located upon lands ceded by the tribe." And in response, as we have seen, that body was informed that for eleven years at least the land department had recognized the location of land with Chippewa scrip outside the ceded territory; also, that a large number of locations had been thus made. In view of this inquiry and information, is it nor more reasonable to infer from the silence of the act in this regard, that it was the intention to extend the remedial privilege conferred to the claimants of such lands, than to infer the contrary? A purpose to deny these claimants the right to perfect their defective titles should, and probably would, have been affirmatively expressed in plain and unambiguous language.

The foregoing observation applies with equal, if not greater, force to cases where patents had previously issued upon such locations. The fact that the secretary of the interior had ordered *unpatented* entries to be canceled, cannot fairly be said to indicate that the action of congress extended only to this class of claimants. Congress knew that one hundred and fifty-six patents, one fourth of the total number, had issued to lands without the ceded territory. The members of that body must be presumed to have known the law; hence

they must be presumed to have known that these original patents were void. Why should they deny the favor to the claimants of this class of patented lands and extend it to parties who had merely selected or "located" lands? Individuals claiming through these patents were as much in need of congressional aid as other claimants. The patents being void, so far as the government title was concerned, it was precisely as if they had never issued. Every consideration of justice and fairness suggested at least the equal necessity for giving relief to the owner of a patent acting in good faith. The word "patented" is not used, it is true; but the word "located," which is used, describes not inaptly the real *status* of these lands. That the secretary of the interior understood the same word as employed in the congressional inquiry to include patented lands, is evidenced by the fact that his report contained, among other things, as we have already seen, "a list of Chippewa half-breed locations *that are patented.*" While the word "location" when used with reference to land ordinarily has a different significance, considering the context of the statute, the information possessed by congress, the construction given by the secretary of the interior in his response, and other associated circumstances, we are satisfied that that officer did not err in the meaning he subsequently attributed to the act.

Nor do we find anything in the statute or in the circumstances attending its adoption excluding the view that its remedial operation extended to "unoffered" as well as to "offered" lands. If it be true, as claimed, that the land department had permitted parties to locate and patent by means of Chippewa half-breed scrip, "unoffered" lands, congress had or could easily have obtained information of the fact. There was nothing to prevent extending the remedial legislation to the owners of such patented lands, notwithstanding the provisions of the act of 1820 relating to the subject. Congress had the power to waive in this, or in any other given instance, the particular requirement of that act touching the "offering" of lands. We shall decline to recognize

this exception from the act of 1872.    Besides, the duty of first offering lands at public auction is imposed upon the land department.    And the assertion of counsel for appellee may be correct, that even if such " offering " were required under the act of 1872 the patent authorizes a presumption, conclusive in actions at law, that this antecedent duty was performed.

The contention that Brown could not have been an innocent party in good faith within the meaning of the statute of 1872, because he must be held to have known the law of 1854 and therefore have been aware that the land in controversy could not be taken with Chippewa scrip, is substantially answered by the foregoing discussion.    Though scrip issued at a later date mentions this limitation, there was nothing on the face of the certificate of Mary Dauphinias in relation thereto; the treaty did not show it; and while ignorance of law is no excuse, as a matter of fact there was much to justify the reliance placed by Brown and others, similarly situated, upon the prior uniform declarations and rulings of the land department touching the subject.    These and similar considerations were probably potent in producing the remedial statute.    Moreover, in our judgment, the proviso relating to innocence and good faith refers to the mode of issuing or the manner of acquiring the certificate or " claim " on which the entry is based, not to the entry itself.    It was in the issue of these certificates that the frauds in contemplation by congress were mainly perpetrated; and unless the party invoking the statute was in some way connected with such frauds, he should not be denied the benefit of the legislation.    Thus the question of innocence and good faith under the statute becomes clearly a question of fact, not of law.    And since the determination thereof was lodged exclusively with the secretary of the interior, his finding in favor of Brown is conclusive upon the courts.

The act of 1872 is not entirely free from ambiguity.    The able and ingenious argument of counsel for appellant receives color of support from its phraseology, coupled with certain circumstances attending its adoption.    But, as indicated by

the foregoing discussion, we think counsel advocates too narrow a view touching its scope and effect. We cannot indorse his contention, that the secretary of the interior misapprehended its purpose, and in awarding the patent to Brown acted without authority of law, and hence without jurisdiction. The interpretation given by that officer to the act is sustained, as we have seen by approved rules of statutory construction as well as by strong considerations of fairness and equity.

We shall decline to interfere with the judgment of the court below. It is accordingly

*Affirmed.*