**Leroy LOGAN, Raymond Lasley, Frances Holding, Hazel Harper, Arita Jump, Anthony Daniels, and Rosa L. Jake, Plaintiffs,**

v.

**Cecil D. ANDRUS, Secretary of the Interior, Benjamin Reifel, Commissioner of Indian Affairs, Bureau of Indian Affairs, Defendants,**

**Osage Tribal Council, Party Defendant.**

No. 77–C–363–C.

United States District Court, N. D. Oklahoma.

Oct. 5, 1978.

Don B. Miller, Native Amer. Rights Fund, Washington, D. C., Walter R. Echo-Hawk, Bruce R. Greene, Native Amer. Rights Fund, John G. Ghostbear, Tulsa, Okl., for plaintiffs.

C. David Redmon, U. S. Dept. of Justice, Washington, D. C.,. Hubert A. Marlow, Tulsa, Okl., for defendants.

Ralph R. Adkisson, Tulsa, Okl., D. E. Martin, Tulsa, Okl., for Osage Tribal Council.

## ORDER

COOK, District Judge.

The plaintiffs in this action are seven (7) enrolled members of the Osage Tribe of Indians,[1] each of whom resides in the State of Oklahoma and owns one or more Osage "headrights".[2] Originally named as defendants were the Secretary of the Interior and the Commissioner of Indian Affairs (hereinafter "federal defendants"). This action was filed in the United States District Court for the District of Columbia and was subsequently transferred to this Court pursuant to 28 U.S.C. § 1406. Following the transfer, this Court, on the motion of the federal defendants, Ordered that the Osage Tribal Council (Council) be added as a necessary party defendant under Rule 19(a)(2) of the Federal Rules of Civil Procedure. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 2201.[3]

---

1. The defendants deny that the plaintiffs are enrolled members of the Osage Tribe; however, the Court views that dispute as immaterial either to the existence of subject matter jurisdiction or to the issues raised in plaintiffs' motion for summary judgment.

2. A "headright" is the right to receive trust funds and mineral interests at the end of the trust period, as hereinafter described, and during that period to participate in the distribution of the bonuses and royalties arising from the mineral estate and the interest on the trust funds. *United States v. Mason,* 412 U.S. 391, 393, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); *Globe Indemnity Co. v. Bruce,* 81 F.2d 143, 148–149 (10th Cir. 1935).

3. The Court has previously overruled the defendants' motion to dismiss, which was based in part upon an alleged lack of subject matter jurisdiction.

The plaintiffs allege that the Council was created by the Act of June 28, 1906, 34 Stat. 539 (hereinafter "Osage Allotment Act"), solely to dispose of certain tribal assets and to manage the mineral resources of the Tribe, and was not intended to be a general governing body. They contend that the Osage Tribe has neither a general tribal government nor a constitution or bylaws. Plaintiffs allege that the federal defendants have acted beyond the scope of their authority in approving actions taken by the Council beyond those expressly enumerated in the Osage Allotment Act, as amended. The plaintiffs further allege that the federal defendants routinely approve disbursements of tribal trust funds for activities unrelated to the management of the Osage mineral estate and that such actions constitute violations of fiduciary standards and the Fifth Amendment to the United States Constitution. The plaintiffs request a declaratory judgment in accordance with their allegations. The defendants take the position that the Council possesses general powers of tribal government and is not limited to the activities prescribed by the Osage Allotment Act. They further contend that any expenditures of trust funds have been necessary and proper and have benefitted all members of the Tribe, including the plaintiffs. Now before the Court for consideration is the motion of the plaintiffs for summary judgment. The parties have filed extensive briefs and presented oral arguments in support of their positions and have stipulated that there is no genuine issue as to any material fact which would preclude the Court from ruling on the merits of the plaintiffs' motion.

■■■■ Indian tribes have always been considered as distinct, independent, political communities. *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1833). As such, they are ". . . qualified to exercise powers of self-government, not by virtue of any delegation of powers from the federal government, but rather by reason of their original tribal sovereignty." F. Cohen, *Handbook of Federal Indian Law,* p. 122 (hereinafter referred to as "Cohen"). *See also Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *United States v. Wheeler,* 435 U.S. 313, 55 L.Ed.2d 303 (1978); *United States v. Kogama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); *The Kansas Indians,* 72 U.S. (5 Wall.) 737, 18 L.Ed. 667 (1866). "Indian self-government, the decided cases hold, includes the power of an Indian tribe to adopt and operate under a form of government of the Indians' choosing [and] to define conditions of tribal membership. . . ." Cohen at 122.[4] Treaties with the Indian tribes uniformly contained provisions in which the Indians acknowledged that they were under the protection of the United States and of no other sovereign whatsoever.[5] The recognition of that dependent status did not deprive the tribes of sovereign powers which they otherwise possessed, even in the absence of a specific recognition by the United States of the continuance of the right of self-government.[6] *United States v. Wheel-*

---

**4.** Self-government also includes the power ". . . to regulate domestic relations of members, to prescribe rules of inheritance, to levy taxes, to regulate property within the jurisdiction of the tribe, to control the conduct of members by municipal legislation, and to administer justice." Cohen at 122.

**5.** For example, the Osage treaty of November 10, 1808, 7 Stat. 107, provides as follows in Article 10, 7 Stat. at 109:

"The United States receive the Great and Little Osage nations into their friendship and under their protection; and the said nations, on their part, declare that they will consider themselves under the protection of no other power whatsoever; disclaiming all right to cede, sell or in any manner transfer their lands to any foreign power, or to citizens of the United States or inhabitants of Louisiana, unless duly authorized by the President of the United States to make the said purchase or accept the said cession on behalf of the government."

**6.** All of the treaties between the United States and the Osage Indians are silent regarding the power of the tribe to govern itself. *See* Treaty of November 10, 1808, 7 Stat. 107; Treaty of September 12, 1815, 7 Stat. 133; Treaty of September 25, 1818, 7 Stat. 183; Treaty of August 31, 1822, 7 Stat. 222; Treaty of June 2, 1825, 7 Stat. 240; Treaty of August 10, 1825, 7 Stat. 268; Treaty of August 24, 1835, 7 Stat. 474; Treaty of May 26, 1837, 7 Stat. 533; Treaty of January 11, 1839, 7 Stat. 576; Treaty of September 29, 1865, 14 Stat. 687.

*er, supra; The Kansas Indians, supra; Worcester v. Georgia, supra.* However,

"Indian tribes are, of course, no longer 'possessed of the full attributes of sovereignty.' [citation omitted]. Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised."

*United States v. Wheeler, supra,* 435 U.S. at 323, 98 S.Ct. at 1086. All rights of sovereignty exercised by Indian tribes are subject to the supreme legislative authority of the United States. *Talton v. Mayes,* 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896). Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess, *Santa Clara Pueblo v. Martinez, supra,* including the power to determine their own form of government, *United States v. Wheeler, supra; Gritts v. Fisher,* 224 U.S. 640, 32 S.Ct. 580, 56 L.Ed. 928 (1912), and their power to define the members of the tribe, *Gritts v. Fisher, supra; Wallace v. Adams,* 204 U.S. 415, 27 S.Ct. 363, 51 L.Ed. 547 (1907); 25 U.S.C. § 184. In sum, Indian tribes possess an inherent sovereignty except where it has been specifically taken away from them by treaty or by act of Congress.[7] *United States v. Wheeler, supra; Oliphant v. Suquamish In-*

*dian Tribe,* 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978); *Roff v. Burney,* 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897); *Groundhog v. Keeler,* 442 F.2d 674 (10th Cir. 1971).

As a matter of necessity, Congress has delegated much of its power over the Indians to administrative officials. Cohen at 100.

"Historically, the Secretary of the Interior has been the delegated arm of the Federal government to act as the guardian of the Indian ward; to administer the affairs of its Indians, and to that end has been granted wide discretionary powers in the enforcement of the declared Congressional policy."[8]

*Board of Commissioners of Pawnee County, Oklahoma v. United States,* 139 F.2d 248 (10th Cir. 1943), cert. denied 321 U.S. 795, 64 S.Ct. 846, 88 L.Ed. 1084 (1944). However, the power of the Interior Department over Indians is not absolute.

"The claim of administrative officers to plenary power to regulate Indian conduct has been rejected in every decided case where such power was not invoked simply to implement the administration of some specific statutory or treaty provision."

Cohen at 103. *See, e. g. Francis v. Francis,* 203 U.S. 233, 27 S.Ct. 129, 51 L.Ed. 165 (1906); *Jones v. Meehan,* 175 U.S. 1, 20

---

7. Cohen summarizes the nature of Indian sovereignty at p. 123 of his treatise as follows: "The whole course of judicial decision on the nature of Indian tribal powers is marked by adherence to three fundamental principles: (1) An Indian tribe possesses, in the first instance, all the powers of any sovereign state. (2) Conquest renders the tribe subject to the legislative power of the United States and, in substance, terminates the external powers of sovereignty of the tribe, e. g., its power to enter into treaties with foreign nations, but does not by itself affect the internal sovereignty of the tribe, i. e., its powers of local self-government. (3) These powers are subject to qualification by treaties and by express legislation of Congress, but, save as thus expressly qualified, full powers of internal sovereignty are vested in the Indian tribes and in their duly constituted organs of government."

8. The Act of March 3, 1849, 9 Stat. 395, which created the Department of the Interior, provided in Section 5 "[t]hat the Secretary of the

Interior shall exercise the supervisory and appellate powers now exercised by the Secretary of the War Department, in relation to all acts of the Commissioner of Indian Affairs." The Act of July 27, 1868, 15 Stat. 228, transferred the powers of the Secretary of the Treasury over Indian affairs to the Secretary of the Department of the Interior. Title 43 U.S.C. § 1457 provides that "[t]he Secretary of the Interior is charged with the supervision of public business relating to the following subjects and agencies: . . . 10. Indians." Title 25 U.S.C. § 2 provides that "[t]he Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations." The President's regulatory power is contained in 25 U.S.C. § 9, which authorizes him to prescribe regulations " . . . for carrying into effect the various provisions of any act relating to Indian affairs. . . . ."

S.Ct. 1, 44 L.Ed. 49 (1899). "However laudable may be the motives of the Secretary [of the Interior], he, as all others, is bound by the provisions of congressional legislation."[9] *Ballinger v. Frost,* 216 U.S. 240, 249, 30 S.Ct. 338, 340, 54 L.Ed. 464 (1910). An administrative official cannot exercise legislative power under the guise of regulation. *United States v. George,* 228 U.S. 14, 33 S.Ct. 412, 57 L.Ed. 712 (1913).

Within the framework of the foregoing principles of Indian law, it is necessary to examine the manner in which the Osages have exercised their sovereign power of self-government and the manner in which the United States has responded to that action. For the purpose of this case, the relevant starting point for such an examination is December 31, 1881, the date of adoption of the Constitution of the Osage Nation. The Constitution established a tripartite system of government modeled after that of the United States. Legislative power was vested in a National Council, composed of fifteen (15) members, three (3) elected from each of five (5) districts for terms of two (2) years. The National Council was given, *inter alia,* the power " . . . to make all laws and regulations which they shall deem necessary and proper for the good of the Nation . . ." and the power " . . . to make laws for levying and collecting taxes for the purpose of raising revenue." Executive power was lodged in the Principal Chief, who was given the responsibilities of seeing that the laws were faithfully executed, of approving or rejecting bills passed by the National Council, and of nominating three members of, and serving on, an Executive Council. The Constitution also created the office of Assistant Principal Chief, who was to act as Principal Chief in the absence of the Principal Chief, to advise the Principal Chief in the administration of the government, and to serve on the Executive Council. The Osage Constitution also created a judicial system, comprised of a Supreme Court and such Circuit and Inferior Courts as established by the National Council.

The Osage Nation functioned under its constitutional form of government until 1900, when the Secretary of the Interior issued orders purportedly abolishing the tribal government, with the exception of the offices of Principal Chief and Assistant Principal Chief.[10] The Secretary advised the Tribe that its affairs would thereafter be directly administered by the Bureau of Indian Affairs and the Department of the Interior.[11] However, the National Council failed to dissolve in response to the Secretarial orders.[12]

"In 1903 the Secretary issued instructions that a Business Committee of eight members be formed, said members to be elected initially by the 'so-called Osage council' and thereafter by majority vote of the qualified voters of the tribe. When the executive council failed to take action on that directive, the Secretary requested the Principal Chief to select eight members of the existing council to serve with

---

**9.** In the words of the Ninth Circuit, "[i]n his dealings with the Indians, the Secretary of the Interior does not have the power of an Asiatic potentate or even of a benevolent despot. He, like his wards themselves, is subject to legislative restrictions." *United States v. Arenas,* 158 F.2d 730, 747–748 (9th Cir. 1946).

**10.** Report of the Commissioner of Indian Affairs of October 1, 1900. Sources: 1 Washburn, *The American Indian & the United States,* 701; 5 Fay, *Charters, Constitutions & By-Laws of the Indian Tribes of North America* 102. *See also* H.R.Rep. No. 92–963, 92d Cong., 2d Sess. 7 (1972) (hereinafter referred to as "H.R.Rep. No. 92–963"); Hearing on S.1456 and S.3234 Before the Comm. on Interior and Insular Affairs, 92d Cong., 2d Sess., at 14 (1972) (hereinafter referred to as "Hearing on S.1456 and S.3234"). The Interior Department gave the following as the reasons for its actions:

"The principal causes that led to the abolition of the Osage Tribal government were: (1) Acrimonious disputes between the two factions over elections; (2) entire absence of harmony between the Osage tribal officers and the Indian agent in the administration of tribal affairs; (3) the selection of ignorant men as officeholders, and (4) the profligate use of moneys received from permit taxes." Report of the Commissioner of Indian Affairs of October 1, 1900, *supra.*

**11.** H.R.Rep. No. 92–963 at 7; Hearings on S.1456 and S.3234 at 14.

**12.** *Id.*

him on the first Business Committee, to act upon such matters as 'are brought before the council under the present arrangement' and such other business as submitted to the Business Committee by the Indian agent under direction of the Commissioner of Indian Affairs, with Secretarial approval." [13]

H,R.Rep. No. 92–963 at 7; Hearings on S.1456 and S.3234 at 14. The so-called Business Committee was appointed by the Principal Chief and continued in existence until the passage of the Osage Allotment Act.[14]

■ Before proceeding to analyze the Osage Allotment Act, the primary Congressional enactment involved in this case, it is necessary to examine the validity of the actions taken by the Secretary of the Interior in 1900 in purportedly abolishing the tribal government of the Osage Tribe. As we have seen, the Secretary does not have plenary authority over the exercise of sovereign powers by the Indian tribes. We have also seen that those powers are subject to limitation only by the Congress. There is absolutely no indication that Congress in any way delegated, or attempted to delegate,[15] its power to abolish Indian self-government to the Secretary of the Interior. Under the circumstances, the Court is led to the inescapable conclusion that the Secretary of the Interior was attempting to exercise legislative power when he purportedly abolished the government of the Osage Nation in 1900 and that such action was therefore beyond the scope of his authority and of no legal effect. *See Harjo v.*

13. The letter from the Acting Secretary of the Interior to the Principal Chief of the Osage Nation requesting the formation of a Business Committee is reproduced in S.Rep. No. 4210, 59th Cong., 1st Sess. 4 (1906) (hereinafter referred to as "S.Rep. No. 4210").

14. H.R.Rep. No. 92–963 at 7; Hearings on S.1456 and S.3234 at 14.

15. The Court is inclined to believe that such action by the Congress, if in fact taken, would have been an unlawful attempt to delegate its legislative power and therefore void. *See United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); *United States v. Shreveport Grain & Elevator Co.,* 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175 (1932); *Crain v. First*

*Kleppe,* 420 F.Supp. 1110 (D.D.C.1976). Consequently, at the time of the passage of the Osage Allotment Act, the Osage Nation was still functioning, as a matter of law, under its 1881 Constitution, and it becomes necessary to determine what action, if any, was taken by the Congress in that Act, or in subsequent legislation, to limit, expand or otherwise modify the government of the Osage Nation.

■ There are several canons of construction and interpretation of Indian legislation which should be discussed before examining the acts relating to the Osages. The most general rule is that legislation affecting the Indians is to be liberally construed in their interest and doubtful expressions resolved in their favor. *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 96 S.Ct. 1793, 48 L.Ed.2d 294 (1976); *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918); *United States v. Nice,* 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192 (1916); *Choate v. Trapp,* 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941 (1912); *United States v. Celestine,* 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909). Indian legislation must be construed in light of the common notions of the day, the assumptions of the draftsmen and the policy which the legislation was intended to execute.[16] *Oliphant v. Suquamish Indian Tribe, supra; Levindale Lead Co. v. Coleman,* 241 U.S. 432, 36 S.Ct. 644, 60 L.Ed. 1080 (1916). While the assimilationist policy prevailing at the beginning of the twentieth century must certainly be considered, it is important to note that present federal policy favors the strengthening of tribal self-government,[17] for

*National Bank of Oregon, Portland,* 324 F.2d 532 (9th Cir. 1963); *Board of Commissioners of Pawnee County, Oklahoma v. United States, supra.* However, since the record reveals no attempt by Congress to delegate such power, the Court need not, and does not, decide the issue.

16. In the case of the Osage Allotment Act, that policy was one of concern for the welfare of the Indians. *Levindale Lead Co. v. Coleman, supra.*

17. *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976).

" . . . courts 'are not obliged in ambiguous instances to strain to implement [an assimilationist] policy Congress has now rejected, particularly where to do so will interfere with the present congressional approach to what is, after all, an ongoing relationship'."

*Bryan v. Itasca County,* 426 U.S. 373, 389 n. 14, 96 S.Ct. 2102, 2111, 48 L.Ed.2d 710 (1976). As the agency charged with the administration of Indian laws, the Interior Department's interpretation of those laws is entitled to "great weight." *United States v. Jackson,* 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361 (1930). "However, the power to issue regulations is not the power to change the law," *United States v. New England Coke & Coal Company,* 318 F.2d 138, 143 (1st Cir. 1963), and it is the duty of the courts to determine if an agency's interpretation is consistent both with its earlier or later pronouncements and with the intent of Congress. *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *United States v. New England Coke & Coal Company, supra.* There is a presumption that a statute is not intended to make a radical change in Indian affairs, and courts must insist that such a purpose be made clear by Congress. *United States v. Nice, supra; U. S. v. Celestine, supra.* See also *Bryan v. Itasca County, supra.* In *Harjo v. Kleppe, supra* at 1142, the court summarized the applicable rules of construction in a case factually similar to the instant one, in which a claim was made that the government of the Creek Indians had been abolished:

"Congress undoubtedly has the power . . . to terminate the existence of the tribe entirely. However, because such an abolition of the Creek constitutional government would have been tantamount to a total repudiation of the tribe's right, . . . to determine its own form of organization and government—and indeed a final repudiation of tribal sovereignty itself—familiar principles of statutory construction in general

and of interpretation of federal Indian law in particular mandate that such congressional action be clear and explicit; where the statutes and their legislative histories fail to clearly establish such an intent, the Court may not supply one by judicial interpretation."

It is within the framework of the above rules of statutory construction that the Osage Allotment Act must be examined.

Section 1 of the Osage Allotment Act provided for a roll of the members of the tribe. Section 2 authorized a division of tribal lands among the members of the tribe as established in Section 1. All of the minerals contained on those lands were reserved to the Osage tribe for a period of twenty-five (25) years [18] in Section 3, which also authorized the execution of mineral leases. Section 4 provided that all monies due to the Osage tribe, including mineral royalties, were to be held in trust by the United States for a period of twenty-five (25) years.[19] The funds so held were to be segregated and placed to the credit of the individual members of the tribe, each such member to receive a quarterly distribution of his pro-rata share of interest earned on the trust funds. Under the provisions of Section 5 of the Act, all lands, moneys and mineral interests were to become the absolute property of the individual members of the tribe at the end of the trust period. Sections 6, 7 and 8 of the Act provided for the inheritance of trust property, the right to lease the lands for agricultural purposes and the execution of deeds by the Principal Chief with the approval of the Secretary of the Interior, respectively. Section 9, the section primarily in issue in this case, provided for the election of tribal officers. Sections 10 and 11 reserved land for public highways and railroads, respectively, and Section 12 gave the Secretary of the Interior the authority to do all things necessary to carry into effect the provisions of the Act.

---

**18.** This period has been extended several times. The most recent extension is until April 28, 1983, and thereafter until otherwise provided by Act of Congress. 78 Stat. 1008 (1964).

**19.** This period has also been extended. *See* note 18, *supra.*

A closer examination of some of the language used by Congress in the Osage Allotment Act reveals, to a certain extent, its intent at the time it was enacted. Section 1 contains more than one provision of significance in the context of this case. That section described the roll of the Osage tribe and provided that it ". . . is hereby declared to be the roll of said tribe and to constitute the legal membership thereof." 34 Stat. at 540. Congress thereby exercised its plenary power to control membership in Indian tribes[20] and defined for all purposes the members of the Osage Tribe of Indians. Section 1 also gave to the Principal Chief the authority to file with the Secretary of the Interior a list of names which the tribe claimed were placed upon the roll by fraud. Significantly, Congress used the following language in that regard:

". . . [N]o name shall be included in said list of any person or his descendants that was placed on said roll prior to the thirty-first day of December, eighteen hundred and eighty-one, *the date of the adoption of the Osage constitution . . .*" 34 Stat. at 540. (Emphasis added).

Congress thereby explicitly acknowledged the existence of the Osage Constitution and gave no indication anywhere in the Act that it either intended to abolish the Constitution or considered it as having been previously abolished. Section 9 of the Osage Allotment Act provided in its entirety as follows:

"That there shall be a biennial election of officers for the Osage tribe as follows: A principal chief, an assistant principal chief, and eight members of the Osage tribal council, to succeed the officers elected in the year nineteen hundred and six, said officers to be elected at a general election to be held in the town of Pawhuska, Oklahoma Territory, on the first Monday in June; and the first election for said officers shall be held on the first Monday in June, nineteen hundred and eight, in the manner to be prescribed by the Commissioner of Indian Affairs, and said officers shall be elected for a period of two years, commencing on the first day of July following said election, and in case of a vacancy in the office of principal chief, by death, resignation, or otherwise, the assistant principal chief shall succeed to said office, and all vacancies in the Osage tribal council shall be filled in a manner to be prescribed by the Osage tribal council, and the Secretary of the Interior is hereby authorized to remove from the council any member or members thereof for good cause, to be by him determined." 34 Stat. at 545.

The section provided for the election of officers *for the Osage tribe.* Absent some limiting language, the Court must assume that Congress meant what it said and that such a reference was to officers of some type of general tribal government. The first election mandated by the section was to be held in 1908, and the officers were to *succeed* the officers elected in 1906. Clearly, Congress intended that the officers elected in 1906, presumably under the Osage Constitution, would remain in office until the new election date in 1908. The use by Congress of the term "tribal council" in Section 9 may also have some significance, as that term has been used in other Indian legislation in obvious reference to the general governing body of a tribe.[21] The only specific functions delegated to the Tribal Council in the Act itself were the appointment of one member to a commission to divide Osage land among Osage tribal members,[22] the execution of mineral leases, with the approval of the Secretary of the Interior,[23] and the authority to requisition money from an emergency fund for the Osage tribe.[24] The plaintiffs contend that Congress gave to the Tribal Council the authority to perform only those functions, and no others. However, because the enumerated functions involved subject matters which were created by the Act, a dele-

**20.** *See Gritts v. Fisher, supra; Wallace v. Adams, supra.*

**21.** *See, e. g.,* 25 U.S.C. § 476.

**22.** Section 2, paragraph 6, 34 Stat. at 541.

**23.** Section 3, 34 Stat. at 543.

**24.** Section 4, paragraph 4, 34 Stat. at 544.

gation of responsibility in those areas to some person or entity was a necessity, and Congress' choice of the Tribal Council is as consistent with its recognition of that body as a general legislative one as it is with an intent to limit the Council's authority exclusively to those functions. From an examination of the language of the Osage Allotment Act, the Court is led to the conclusion that Congress intended only to expand the authority of the Tribal Council and to modify the procedure for the election of tribal officers,[25] and neither to abolish the officers already in existence nor to create entirely new ones.[26] It would not have been difficult for Congress to explicitly abolish the tribal government, or any part of it, had that been its intent.

The legislative history of the Osage Allotment Act[27] is not inconsistent with this Court's interpretation of the intent of Congress.[28] As originally proposed, the Act would have given the Tribal Council the right to select a majority of the members of the allotting commission. The Commissioner of Indian Affairs urged that the provision be changed, as it ultimately was, for the following reason:

> ". . . I would say that it is known to this Department by unquestioned proof, if not by the admissions of the members themselves, that certain members of the Osage Council *are absolutely corrupt.* This being true, it is believed that the selection of a majority of the allotting commission by the council might be fatal to the interests of very many of the Indians, and it should not be allowed." (Emphasis added).

S.Rep. No. 4210 at 5. The Interior Department also supported the amendment to Section 9 which gave the Secretary ultimate control over membership in the Council. The Commissioner felt that ". . . be-

---

**25.** The details of the election procedures are set forth in 25 C.F.R. § 73.1 *et seq.* Section 73.21 provides that

> "[o]nly members of the Osage Tribe who will be twenty-one years of age or over on election day and whose names appear on the quarterly annuity roll at the Osage Agency as of the last quarterly payment immediately preceding the date of election will be entitled to hold office or vote for any tribal officers."

One of the plaintiffs' primary objections to the exercise of general legislative authority by the Osage Tribal Council is that the Council represents only those who have an interest in the mineral estate. However, as previously noted, Section 1 of the Act limited the tribal membership to that class of Osage Indians. Therefore, Congress has withdrawn from all those Osages not included in the tribe as defined in Section 1 the right to participate in the tribal government and, consequently, the right to complain of the inability to so participate. The right to representation in the Osage tribal government is an issue which can only be resolved by legislative enactment, and not by judicial decree.

**26.** The limited number of cases involving Section 9 of the Act are not inconsistent with this Court's interpretation. For instance, in discussing that section, the court in *United States v. Board of Commissioners of Osage County, Oklahoma,* 193 F. 485, 489 (W.D.Okl.1911), said that ". . . it was well known that ample interests would in the future *continue to command the attention of the tribal organization* . . . ." (Emphasis added). In *United States v. Aaron,* 183 F. 347, 349 (W.D.Okl. 1910), the same court noted that ". . . the

act of June 28, 1906 . . . recognizes a continuation of the tribe. Section 9."

**27.** The Court requested that each party submit copies of the legislative history which supported its position. The plaintiffs submitted excerpts from the histories of the Osage Allotment Act and subsequent Osage legislation. The defendants have taken the position that legislative histories are irrelevant to this case and therefore did not submit any such material to the Court.

**28.** As originally proposed, the Act provided for the perpetual continuance of the Tribal Council. The Commissioner of Indian Affairs recommended that the Council be abolished at the expiration of the trust period. *See* S.Rep. No. 4210 at 4. The plaintiffs contend that this recommendation, which was not adopted by Congress, as well as subsequent legislation which did so limit the Council's existence, 45 Stat. 1478 (1929), somehow indicates that Congress intended to limit the authority of the Tribal Council exclusively to matters related to the trust estate. However, Congress similarly limited the existence of the governments of other tribes, *e. g.* the Five Civilized Tribes (Choctaw, Chickasaw, Cherokee, Creek and Seminole), which clearly had responsibilities unrelated to trust property. *See, e. g.,* 34 Stat. 822 (1906); 34 Stat. 137 (1906); 30 Stat. 495 (1898). Consequently, the Court does not consider the Commissioner's recommendation, or the 1929 legislation, to be inconsistent with its interpretation of Congressional intent.

cause it has been found that certain members of the tribal council *are corrupt* it is believed that the Secretary of the Interior should have the power to dismiss any councilman for good and sufficient cause." *Id.* at 6. (Emphasis added). The Secretary himself stated that "[t]his amendment I must insist upon in view of the recent attempted frauds and actual bribery which have been acknowledged by the members of the present council, the absolute control of which must be vested in the Department. . . ." *Id.* at 7. It is clear that the Department of the Interior was concerned with the character of the members of the Council as it then existed and as it was to continue under the Osage Allotment Act and the Osage Constitution. Its concern would not have been as great, or of the same nature, had the intent been to completely abolish the existing Tribal Council.

The plaintiffs also contend that subsequent legislation dealing with the Osages, and its legislative history, supports their interpretation of the intent of Congress at the time of the passage of the Osage Allotment Act. The Court does not agree. The primary substantive amendment to Section 9 is found in an Act of March 2, 1929, 45 Stat. 1478. The amendment changed the biennial election to a quadrennial one, gave removed officers due process rights and added the following phrase to Section 9: ". . . [S]aid *tribal government* so constituted shall continue in full force and effect to January 1, 1959." (Emphasis added). In similar statutes dealing with the Five Civilized Tribes, the term "tribal government" was obviously meant to refer to a government with broad and general

powers.[29] The plaintiffs also rely upon several appropriations acts. For instance, Congress has authorized the expenditure of Osage trust funds for the education of Osage children,[30] the employment of special counsel to assist in the prosecution of those charged with the murder of Osage Indians,[31] necessary expenses in connection with oil and gas production[32] and per diem and travel expenses of Council members.[33] Plaintiffs argue that the appropriations acts "empowered" the Tribal Council to perform the functions for which the funds were to be spent. However, those acts merely authorized expenditures ". . . from the funds held by the United States in trust for the Osage Tribe of Indians in Oklahoma." Absent such express authorization by Congress, those expenditures would have been in violation of the terms of the trust established under the Osage Allotment Act, and that authorization cannot be construed as a grant of power to a body otherwise limited in authority to the terms of the Allotment Act.

The plaintiffs also rely upon the legislative histories of subsequent Osage legislation, primarily that relating to the 1972 legislation providing for the distribution of judgment funds to the Osage Nation.[34] Those histories do contain statements made by officials of the Department of the Interior to the effect that the Allotment Act had ". . . created a Tribal Council to manage the mineral rights and to dispose of other tribal assets,"[35] and that ". . . the tribal council's powers are limited to actions taken within the purview of the mineral trust estate."[36] However,

**29.** *See, e. g.,* 34 Stat. 822 (1906); 34 Stat. 137 (1906); 32 Stat. 982 (1903); 30 Stat. 495 (1898).

**30.** *See, e. g.,* 63 Stat. 765, 775 (1949); 62 Stat. 1112, 1122 (1948); 61 Stat. 460, 469 (1947); 42 Stat. 552, 574 (1922); 41 Stat. 1225, 1241 (1921).

**31.** *See* 44 Stat. 453, 476 (1926).

**32.** *See, e. g.,* 63 Stat. 765, 775 (1949); 62 Stat. 1112, 1122 (1948); 61 Stat. 460, 469 (1947); 44 Stat. 453, 476 (1926); 42 Stat. 552, 574 (1922); 41 Stat. 1225, 1241 (1921).

**33.** *Id;* 52 Stat. 1034, 1035 (1938). It should be noted that the expenses of Council members

were to be paid when they were ". . . engaged on business of the tribe . . ." (63 Stat. at 775), or ". . . making necessary trips to the city of Washington and other places in connection with Osage tribal affairs." (52 Stat. at 1035). Such language does not indicate that the Tribal Council is limited only to matters involving the trust estate.

**34.** 25 U.S.C. § 883 *et seq.*

**35.** Hearing on S.1456 and S.3234 at 10.

**36.** *Id.* at 102.

not even legislative declarations of the intent of a previous act are not absolutely controlling. *Levindale Lead Co. v. Coleman, supra,* and plaintiffs are relying upon an agency's interpretations which are inconsistent with statements made both at the time the Act in issue was passed and at the present time and which the Court finds to be inconsistent with the intent of Congress. Therefore, the Court does not consider those interpretations of the Department of the Interior to be controlling in this case.

■ A comparison of the Osage Allotment Act with other Indian legislation is helpful in determining the intent of Congress when it enacted the former. In its statutes dealing with the Five Civilized Tribes, Congress continually and explicitly provided for the termination of the tribal governments in the year 1906.[37] On March 2, 1906, Congress extended the existence of the tribes and their governments until the distribution of all tribal property to individual tribal members.[38] In the Act of April 26, 1906, 34 Stat. 137, providing for the final disposition of the affairs of the Five Civilized Tribes, reference was made throughout to the dissolution of the tribal governments. The Osage Allotment Act was passed on June 28, 1906 and contained no reference to the termination of the Osage tribal government. The Five Civilized Tribes legislation, enacted within months of the Osage Allotment Act, ". . . is cogent proof that Congress knew well how to express its intent directly when that intent was to [terminate tribal governments]." *Bryan v. Itasca County, supra,* 426 U.S. at 389, 96 S.Ct. at 2111. Congress has passed two acts dealing with the constitutional organization of Indian tribes: the Wheeler-Howard Act, also known as the Indian Reorganization Act, 25 U.S.C. § 476, and the Oklahoma Indian Welfare Act, 25 U.S.C. § 503. Neither act applies to the Osage tribe,[39] and the plaintiffs contend that the tribe has thereby been rendered powerless to adopt a constitution. However, absent express legislation to the contrary, the Osage tribe possesses the inherent sovereign power to form a constitutional government, irrespective of any authority which might have been granted in those two acts. *See Harjo v. Kleppe, supra* ; Cohen at 129–130.

To accept the plaintiffs' arguments, the Court would have to impute to Congress an intent to leave the Osage as virtually the only tribe of Indians in the United States without a general governing body or the right to establish such a body. Before the Court would reach such a conclusion, it would require the intent of Congress to be clear and explicit to a degree far beyond that demonstrated in the record of this case.[40]

The plaintiffs also allege that tribal trust funds have been improperly spent in support of activities which are unrelated to the management of the Osage mineral estate. All defendants admit that such expenditures have been made, in the approximate amount of $23,986.77 during the past four years, but contend that such funds represent only a fraction of the income received by the trust during that period and were wisely invested in programs which benefitted all Osage Indians.

■ The United States serves in a fiduciary capacity with respect to the Indians, and it is therefore duty bound to exercise great care in administering its trust. *United States v. Mason,* 412 U.S. 391, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973).

"[The United States] has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards."

---

**37.** 30 Stat. 495, 512 (1898); 31 Stat. 861, 872 (1901); 32 Stat. 716, 725 (1902); 32 Stat. 982, 1008 (1903).

**38.** 34 Stat. 822.

**39.** *See* 25 U.S.C. §§ 473 and 508.

**40.** For a case in which a similar determination was made by a Court presented with an analogous factual situation, *see Harjo v. Kleppe, supra.*

*Seminole Nation v. United States,* 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942).

> "A fundamental duty of the trustee is to carry out the directions of the testator or settlor as expressed in the terms of the trust. Any attempt to take action contrary to the settlor's directions may be deemed to constitute a unilateral and invalid deviation from the trust terms even though the trustee is otherwise given broad discretions in administering the trust."

Bogert, *Trusts & Trustees* § 541 at 155 (Rev. 2d ed. 1978). The terms of the trust in issue here were established in Section 4 of the Osage Allotment Act. Expenditures such as those admittedly made by the defendants in this case are not among those authorized by that Act or by any other legislation of which the Court is aware. Therefore, under the principles of ordinary trust law, and especially the principles applicable to the relationship between the United States and the Indian tribes, the use of Osage trust funds for purposes not specifically authorized by Congress is clearly improper.

For the foregoing reasons, plaintiffs' motion for summary judgment is sustained in part and overruled in part. Judgment is hereby entered declaring that the power of the Osage Tribal Council is not limited to those matters specified by the Act of June 28, 1906, as amended, and further declaring that funds held in trust by the United States for the Osage Tribe of Indians, pursuant to the Act of June 28, 1906, may be used only as specifically authorized by Congress.